1  Paul Hupp
   965 Hidden Oaks Drive
2  Beaumont, CA. 92223
   Paulhupp@sdsualumni.org
3  (951) 769-1268
   *Plaintiff-Appellant*
4  *In Propria Persona*

FILED

MAY 2 2 2008

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY_____ DEPUTY

5

6              UNITED STATES DISTRICT COURT

7            SOUTHERN DISTRICT OF CALIFORNIA

8                                    )  Case No.: 08-cv-00414-H
                                     )
9                                    )
                                     )  {BK No.: 06-00198-JM7}
10 Paul Hupp,                        )  {Adv. Pro. No.: 06-90127-JM7}
                                     )
11          Plaintiff, Appellant     )
                                     )  **PLAINTIFF PAUL HUPP'S OPENING**
12     vs.                           )  **BRIEF ON APPEAL IN THE DISTRICT**
                                     )  **COURT**
13 Educational Credit Management Corporation, )
             Defendant, Appellee     )  Due: May 16, 2008
14                                   )  Served: May 16, 2008
                                     )
15 _____ )

16

17     TO THE HONORABLE MARILYN LOUISE HUFF, UNITED STATES DISTRICT

18 COURT JUDGE, EDUCATIONAL CREDIT MANAGEMENT CORPORATION ("ECMC"),

   UNITED STATES OF AMERICA ("USA") AND COUNSEL OF RECORD:

19     Plaintiff Paul Hupp ("Plaintiff/Mr. Hupp") hereby files his opening brief on appeal in the

20 district court.

21 ///

22 ///

23 ///

24 ///

25

                              Paul Hupp's Opening Brief On Appeal

# **TABLE OF CONTENTS**

I.    INTRODUCTION AND SUMMARY OF ARGUMENT.................................................. 1

II.   STATEMENT OF THE CASE AND APPEALABILITY ................................................ 4

III.  STANDARD OF REVIEW .......................................................................................... 5

IV.   STATEMENT OF FACTS ........................................................................................... 5

V.    LEGAL ARGUMENT AND DISCUSSION................................................................. 6

     1.    Judicial Misconduct-Procedural Due Process
         Violations.......................................................................................................... 6

         A.    Judge Bowie Erred As A Matter Of Law By
             Allowing USAF, An Indispensable Party,
             To Transfer Out of the Case.................................................................... 6

         B.    Judge Bowie Erred As A Matter Of Law By Refusing
             To Implement A Required Rule 16 Scheduling Order ............................... 7

         C.    Judge Bowie Erred As A Matter Of Law By Blocking
             All (100%) Of Mr. Hupp's Discovery Requests......................................... 7

         D.    Judge Bowe Erred As A Matter Of Law By Granting All
             (100%) of ECMC's Discovery No Matter How Irrelevant
             or Prejudicial - Or Barred By The Federal Rules of Evidence ................... 8

         E.    Judge Bowie Erred As A Matter Of Law By Allowing
             Multiple Extensions Of Time to USA - Causing Unnecessary
             And Prejudicial Delay To The Case .......................................................... 8

         F.    Judge Meyers Erred As A Manner Of Law By Engaging
             in *Ex Parte* Communications With USA ................................................... 9

         G.    Judge Meyers Erred As A Mater Of Law By Denying
             To Grant Class Action Certification, Declaratory And
             Injunctive Relief, And To Interplead U.S. Secretary
             Of Education .......................................................................................... 9

     2.    Constitutional Violations......................................................................... 10

         A.    The Trial Court Erred As A Matter Of Law In Not Using A "Strict
             Scrutiny" Standard Of Review In Applying The Constitutional
             Challenges, *Infra*................................................................................... 10

         B.    The Trial Court Erred As A Matter Of Law By Finding Title

U.S.C. § 523(a)(8) And Title 20 Code Of Federal Regulations § 1091a Did Not Violate The Equal Protection Clause Of The Constitution By Not Using A "Strict Scrutiny" Standard Of Review In Applying The Equal Protection Clause .................................... 10

C.   The Trial Court Erred As A Matter Of Law In Not Finding Title 11 U.S.C. § 523(a)(8) And Title 20 Code Of Federal Regulations § 1091a And Supporting Laws Unconstitutional Using Even A "Rational Basis" Review ......................................................................... 16

D.   The Trial Court Erred As A Matter Of Law In Finding No Statute Of Limitations For Student Loans Constitutional, Violating "Mutuality of Contract" And Substantive Due Process Of Law .............. 18

E.   The Trial Court Erred As A Matter Of Law In Finding The Term "Undue Hardship" In U.S.C. § 523(a)(8) Constitutional, When It Is Vague, Ambiguous And Overly Broad ............................................. 18

F.   The Trial Court Erred As A Matter Of Law In Not Finding The Penalties Allowed On Defaulted Student Loans Under 20 Code Of Federal Regulations § 1091a "Unconscionable" ........................ 19

G.   The Trial Court Erred As A Matter Of Law In Finding Laws That Allow Excessive Penalties, Wage Garnishments Without A Court Order, Tax Refund Interceptions And "Ex Post Facto" Laws Constitutional ....................................................... 20

H.   The Trial Court Erred As A Matter Of Law In Not Discharging The Student Loan Debt Because Of The Government's "Unclean Hands" And Knowingly, Willfully, And Intentionally Frustrating The Student Loan Contract .................................................... 20

I.   The Trial Court Erred As A Matter Of Law In Finding The Penalties And Fees Applied To Student Loans Do Not Violate The 8th Amendment's Ban On Excessive Fines ........................................ 21

   1.   "Grossly Disproportional" Penalty Violates The 8th Amendment's Excessive Fines Clause ......................................... 21

   2.   40% Penalties Added To Defaulted Student Loan Debt Is "Grossly Disproportional" ....................................................... 23

3.      The Internal Revenue Service Routinely Settles
        Intentional Tax Cheating For 30% of Face Value-
        Discounting Intentional Criminal And Civil
        Crimes 70%.............................................................................. 24

J.      Mr. Hupp Has Submitted Three (3) Uncontested "Expert
        Witness Reports" Backing Up His Constitutional Challenges

3.   Legal And Factual Errors Applying "Undue
     Hardship" Test....................................................................................... 25

     A.      Judge Meyers Erred As A Matter Of Law In Applying The
             Second Prong Of The Three (3) Prong Brunner "Undue
             Hardship" Test ......................................................................... 25

     B.      Judge Meyers Erred As A Matter Of Fact When He Stated
             Mr. Hupp is Relatively Healthy ................................................ 30

     C.      The Trial Court Erred As A Matter Of Law In Not Finding
             Medical And Dental Care As Significant Factors In
             Discharging Student Loan Debt................................................. 30

     D.      The Trial Court Erred As A Matter Of Fact In Stating Mr.
             Hupp Had Significant Income To Pay His Student Loan,
             Had A "Teaching Job, Had A "Teaching Credential",
             Could Earn $105 Per Day As A Substitute Teacher, Gave
             No Information Regarding His Living Expenses........................ 31

     E.      The Trial Court Erred As A Matter Of Fact In Stating Mr.
             Hupp Did Not Meet The Third Prong Of The Brunner Test -
             Good Faith Effort To Repay The Loan...................................... 32

     F.      The 25 Year William D. Ford Income Contingent Loan
             Program (Forever Loan) Should Not Be Considered In Any
             Student Loan Discharge Based On Tax Liability ...................... 34

VI.    CONCLUSION............................................................................................ 34

1

**TABLE OF AUTHORITIES**

2

**Cases**

3

Alexander v. United States,

4

509 U.S. 544 (1993) ............................................................................................... 22

5

Austin v. United States,

6

509 U.S. 602 (1993) ............................................................................................... 22

7

Bolling v. Sharpe,

8

347 U.S. 497 (1954) ............................................................................................... 20

9

Brunner v. New York State Higher Education Services Corp.,

10

831 F.2d 395 (2d Cir. 1987) .......................................................... 5, 25, 26, 29, 32, 33

11

In re Nys,

12

2006 U.S. App. Lexis 10409, 446 F.3d 938 (9th Cir. 2006) ................................. 26, 27

13

In re Taylor,

14

223 B.R. 747 (B.A.P. 9th Cir. 1998)........................................................................... 5

15

Reynolds v. Pennsylvania Higher Education,

16

425 F.3d 526 (8th Cir. 2005) ................................................................................... 30

17

United States v. Bakajian,

18

524 U.S. 321 (1998) ........................................................................................... 22, 23

19

United Student Aid Funds, Inc. v. Pena,

20

155 F.3d 1108 (9th Cir. 1998) .................................................................................... 5

21

Yick Wo v. Hopkins,

22

118 U.S. 356 (1886) ............................................................................................... 11

23

**Statutes**

24

11 U.S.C. § 523(a)(8).......................................... 4, 10, 11, 13, 15, 16, 17, 18, 19, 24

25

15 U.S.C. § 1692 ............................................................................................. 20

20 C.F.R. § 1091a .......................................................... 11, 13, 15, 16, 18, 19, 20

**Other Authorities**

Volkwein, J. Fredericks et al. 1998, *Factors Associated with Student Loan Default Among*

   *Different Racial and Ethnic Groups* ...................................................................... 12

**Rules**

F.R.B.P. 7016 ................................................................................................... 7

F.R.C.P. Rule 16 .............................................................................................. 7

# I.

## INTRODUCTION AND SUMMARY OF ARGUMENT

This appeal is from a denial of the bankruptcy court to discharge Mr. Hupp's three (3) student loans totaling approximately $7,300, taken out over 20 years ago, 1986-1988.

Mr. Hupp received a degree in education in May 1987. During the next three (3) months, the summer of 1987, Mr. Hupp enrolled in and passed all of his teacher education credential classes. Mr. Hupp had secured a job offer as a teacher in August 1987 in Los Angeles making four (4) times the amount of his student loan debt. (DK# 1).

The Commission on Teacher Credentialing ("Commission") would not grant Mr. Hupp's "Certificate of Clearance"("Clearance") and forced him into a three (3) year legal battle to secure the Clearance, which he was not able to secure at that time. The Commission instructed Los Angeles Unified School District to not allow Mr. Hupp to work, or be hired, while his Clearance was being processed. Mr. Hupp's job offer was thereafter revoked. (DK# 1).

For the next 10 years Mr. Hupp could not secure a job that would pay a living wage, much less pay off his relatively small student loans. The three (3) student loans were consolidated into a single student loan in 1991. Mr. Hupp, unable to pay the loans back based on unemployment and underemployment, asked for and received numerous forbearances and deferments on his student loans from 1987 though December 1997. (DK# 1).

In January 1997 Mr. Hupp was able to secure two (2) jobs as a substitute teacher making between $50 and $85 per day. The jobs were "on call", seasonal, and paid no benefits. Mr. Hupp did not work everyday, he did not work during vacations or holidays and he did not work during the summer. These jobs were available to Mr. Hupp because the two (2) school districts where he was hired were given *waivers* that allowed them to hire, *on an emergency basis*, teachers who did not have a clear teaching credential. These state *required waivers* had to be applied for and approved by the State of California on a yearly basis. Being hired in one (1) academic year was no guarantee of being hired the following year. These two (2) districts were the only ones in San Diego County with substitute teacher *waivers,* allowing them to hire non-credentialed substitute teachers at that point in time.

Paul Hupp's Opening Brief On Appeal

Hupp's monthly *gross* pay was usually in the $1,300 range, after payroll and other taxes it was approximately $900 per month.  Mr. Hupp had these jobs from January 1997 until mid August 1997, when the Commission again instructed the employing school districts to not allow Mr. Hupp to work while his Clearance was being processed. Mr. Hupp was removed from both teaching positions in mid August 1997, and was subsequently terminated from both positions, due directly to the intentional tortious interference of the Commission. (DK# 1).

In August 1997 Mr. Hupp secured a full time teaching position at John Muir Middle School in Los Angeles.  The Commission again contacted the employing district and instructed them not to allow Mr. Hupp to work while his Clearance was being processed.  This was Mr. Hupp's third teaching job within 30 days to be revoked, and fourth (4) teaching job to be revoked overall. (DK# 1).

From July/August 1997 through December 1997 Mr. Hupp started retaking his teacher education classes to receive his clear teaching credential.  Mr. Hupp's student loans were on an educational forbearance during this period.  Loan holders are required by law to give educational forbearances when a student is in school.

Mr. Hupp requested numerous forbearances and hardship deferments starting in December 1997, which the loan holder refused to grant.  Mr. Hupp became unemployed in August 1997 when his teaching jobs were terminated at the Commission's command.  These facts resulted in a <u>forced default</u> on Mr. Hupp's student loans in January 1998.  There was no other option offered to Mr. Hupp to avoid default.  The loan holder, USAF, refused all deferment and forbearance requests, causing the loan to default because Mr. Hupp was unemployed.

Mr. Hupp could not find any employment that paid a living wage, or anything more than part time, minimum, or near minimum wage jobs.  In addition Mr. Hupp had to do the all the legal work on his appeal of the Commissions denial of his Clearance himself, just as he has here in this case, which essentially foreclosed a full time, or even part time, job.

After three (3) years, January 2000, Mr. Hupp won his case and received his Clearance.  But he no longer had a job and his loan had been intentionally **forced into default** by the loan holder- resulting in his loan increasing from $7,300 to over $20,000.  Mr. Hupp had no money to

hire an attorney to sue the Commission and had a wage garnishment sent to the San Diego County Office of Education by the loan holder to attach wages should he be rehired. The wage garnishment was **without a court order** and Mr. Hupp <u>had no due process hearing</u> or other way to challenge or stop its enforcement. (DK# 1).

The educational job market had changed by this point in time and there were no longer any jobs that allowed Mr. Hupp to work in San Diego County as a substitute teacher. The teacher education classes Mr. Hupp took in summer 1987, required to get a clear credential, were no longer valid. The teacher education classes taken in 1997 were useless because the university where he took the classes would not allow him back in the program. So even though Mr. Hupp applied for and secured teaching employment out of college, again secured employment as a teacher in 1997, and won his case against the Commission, he was in a much worse position than when he graduated from college 13 years earlier because of the time required to litigate his case, the costs to litigate his case, the fact he could not work during this time and the fact that he had no legal options to sue the Commission for their unlawful intentional tortious acts.

Mr. Hupp contacted numerous lawyers to sue the Commission and also to file a bankruptcy on his student loan, but no lawyer would take either case without pre-paying hourly fees of $300+ per hour. (DK# 1).

Mr. Hupp to this day cannot work in the education field because he does not have a clear teaching credential (there are no school districts in San Diego County today that have teaching positions using an emergency permit). Mr. Hupp has no money to re-enter a teacher credential program (which would be the third (3) time taking the 1.5-2 year program). (Docket # ("DK#") 1, P: 1-16).

The <u>basic argument of the case is simple and straight forward,</u> the <u>government cannot engage in the type of conduct they did in this case and try to force, or expect, repayment totaling 171 times what was borrowed</u>.

The government and loan holder forced an intentional default (which the government themselves caused by their own actions), added in bogus and ridiculous unearned fees, is trying to require a repayment plan that totals over **$1,200,000+** in repayment liability (yes, you read

1    that right, that is a seven (7) figure amount-one million, two hundred thousand plus dollars), all

2    from an original loan of $7,300.   (DK# 185).

3       There are numerous constitutional issues that are presented, including no statue of

4    limitations, substantive and procedural due process violations, equal protection violations,

5    excessive fines violations, vague, ambiguous and over broadness violations, unconscionable

   contract violations and frustration of contract violations.  In addition, the process of requiring an

6    adversary proceeding of an indigent debtor violates due process.

7       The judicial misconduct by Judge Bowie especially needs to be brought to light and

8    addressed.  The misconduct engaged in by Judge Bowie includes allowing an essential and

9    indispensable party to transfer out of the case against Mr. Hupp's objections, blocking virtually

10    all of Mr. Hupp's requested discovery to prove up his case (100%) and his persistent, repeated

11    and intentional refusal to follow the rules of procedure for proper case management, thereby

12    turning a five (5) month case into a *marathon* 25 month case. (DK# 12, 13, 15, 19, 21, 23).

## II.

## STATEMENT OF THE CASE AND APPEALABILITY

13

14       The case was filed on February 8th, 2006. Service was completed on February 14th, 2006.

15    Mr. Hupp gave notice that he was going to challenge, *inter alia*, the constitutionality of Title 11

16    U.S.C. § 523(a)(8) and Title 20 Code of Federal Regulations § 1091a in October 2006. USA was

17    given notice of the constitutional challenges pursuant to Title 28 U.S.C. § 2403(a) in December

18    2006. USA stated they were intervening in the case in February 2007. Judge Bowie was removed

19    from the case in April 2007 and Judge Meyers was assigned the case.  (DK# 64, 87, 110).

20       In August 2007 a Withdrawal of Reference was heard and denied in the District Court by

21    Judge Hayes. (Case No. 07-cv-1232).

22       On November 29th, 2007 a summary judgment hearing was held (more than one (1) year

23    after it was served due mainly  to Judge Bowie's misconduct) and an order was entered on

   January 9th, 2008 denying relief on the constitutional issues, as well as the issue of "undue

24    hardship".  A trial was held on January 27th, 2008 and an order was entered on February 25th

25    denying relief under the <u>Brunner</u> "undue hardship" test. *See* <u>Brunner v. New York State Higher</u>

Education Services Corp., 831 F.2d 395 (2d Cir. 1987), United Student Aid Funds, Inc. v. Pena, 155 F.3d 1108 (9th Cir. 1998).  Notice of Entry of the judgment was served on February 25th, 2008.

An appeal was filed on February 25th, 2008 seeking review in the District Court. Judge Huff and Judge Meyers both denied requests for certification for a direct appeal to the 9th Circuit Court of Appeals in April and May 2008.  The appeal was timely and the judgment appealable.

This opening brief on appeal in the District Court is due May 16, 2008.

### III.

### STANDARD OF REVIEW

The district court's review of the bankruptcy court in this case involves both factual and legal questions.  Generally speaking, questions of fact are reviewed for clear error, See Pena, *supra*. Conclusions of law are reviewed *de novo*.  In re Taylor, 223 B.R. 747 (B.A.P. 9th Cir. 1998).

### IV.

### STATEMENT OF FACTS

Mr. Hupp borrowed a relatively small amount of money to finance his education at San Diego State University.  He borrowed approximately $7,300 over a three (3) year period. Mr. Hupp received and accepted a job offer within three (3) months of graduating in 1987. The Commission interfered with that job offer and it was revoked.

Mr. Hupp attempted to find other employment during the next 10 years that would allow him to pay living expenses and pay back his student loan.  He could not find a job that paid either.

In 1997 Mr. Hupp received and accepted two (2) job offers as a substitute teacher making $50-$85 each day he worked.  He did not work everyday, nor on holidays or vacation periods. He worked at those two jobs approximately eight (8) months, on call. Mr. Hupp made approximately $10,000 during this eight (8) month period.

The Commission again interfered with his education jobs and he was terminated. The loan holder would not give a loan deferment or forbearance _forcing a default_. The loan had 40% added to the amount owing.

Mr. Hupp spent three (3) years litigating the denial by the Commission, finally winning. After Mr. Hupp's $7,300 loan hit $55,000 with the bogus penalties and fees he filed for bankruptcy in February 2006.

The trial court denied his "undue hardship" claim. This appeal followed.

### V.

### LEGAL ARGUMENT AND DISCUSSION

Plaintiff divides his legal arguments into three (3) sections; 1) Judicial Misconduct and Procedural Due Process Violations, 2) Constitutional Violations and 3) Legal And Factual Errors Applying "Undue Hardship" Test for student loan discharge to the facts in Mr. Hupp's case.

### 1. JUDICIAL MISCONDUCT-PROCEDURAL DUE PROCESS VIOLATIONS

Mr. Hupp filed his bankruptcy case and his adversary proceeding ("AP") against United Student Aid Finds, Inc. ("USAF"), on February 8, 2006. USAF was served on February 14, 2008. Judge Peter Wentworth Bowie was assigned the case. Mr. Hupp made direct claims of loan holder misconduct in his AP. USAF, because of the claims made in Mr. Hupp's AP against them, was therefore an indispensable party to the action. (DK# 1).

#### A.    Judge Bowie Erred As A Matter Of Law By Allowing USAF, An Indispensable Party, To Transfer Out Of The Case

On April 28, 2006 ECMC filed a motion to transfer in as real party in interest, which Mr. Hupp opposed (DK# 12, 15). Because USAF had intentionally and willfully interfered with Mr. Hupp's legal rights to discharge his student loan under the FALSE CERTIFICATION process (a complete defense for the discharge of his student loan) discovery from USAF was essential to his case. (DK# 53:Ex.# 4-20).

Mr. Hupp also served discovery requests on USAF and filed a motion to compel when they refused to respond. (DK# 14,15,16). Judge Bowie allowed ECMC to transfer in as real

party in interest and allowed USAF to transfer out. Judge Bowie then blocked Mr. Hupp's entire propounded discovery requests to USAF. (DK# 19). Without USAF as a direct party to the case Mr. Hupp could not require compliance with discovery requests short of serving a subpoena and filing a motion to compel in an Indiana court more than 2,500 miles away, options not open to Mr. Hupp. This was a serious blow to Mr. Hupp in proving up his case. This act violated basic procedural due process rights.

B.    Judge Bowie Erred As A Matter Of Law By Refusing To Implement A Required Rule 16 Scheduling Order

Judge Bowie, as required under the rules of procedure, was <u>required</u> to institute a F.R.C.P. Rule 16 (F.R.B.P. 7016) scheduling order within 4 months of the complaint being served. Judge Bowie refused to enter such an order despite six (6) requests by Mr. Hupp, both orally and in motions, to institute such an order. (DK# 38, 39, 46, 73, 80, 125). Finally, Mr. Hupp filed a motion to disqualify Judge Bowie for cause, which he denied. (DK# 78, 99).

After an entire year with no scheduling order and the case going nowhere Mr. Hupp filed a Writ of Mandamus complaint against Judge Bowie (1-29-07) in the District Court (case # 07-cv-0182 DMS) to force compliance. Even after Judge Bowie was served with the lawsuit he still refused to follow the rules of procedure and refused to institute a scheduling order or provide any case management whatsoever. Mr. Hupp filed a formal complaint against Judge Bowie with the 9th Circuit Court of Appeals one (1) a month after filing his complaint in the district court.

Immediately before Judge Sabraw could rule on the case in May 2007, Judge Bowie was forced to step down from the AP. (DK# 117). The case at this point was over 15 months old. The delay caused by Judge Bowie's persistent, repeated and pervasive refusal to follow even the most basic and simple rules of procedure turned a five (5) month case into a 25 month case, almost forcing Mr. Hupp to default. This act violated basic procedural due process rights.

C.    Judge Bowie Erred As A Matter Of Law By Blocking All (100%) Of Mr. Hupp's Discovery Requests

Judge Bowie blocked 100% of Mr. Hupp's propounded discovery to both USAF and ECMC, virtually everything. This included **all** interrogatories, **all** requests for documents and **all** requests for admissions-virtually wiping out Mr. Hupp's discovery plan. Judge Bowie gutted Mr. Hupp's entire case by these rulings. (DK# 14, 15, 16, 19, 25, 26, 27, 30, 34, 38, 41, 46, 47, 48, 57, 58, 69, 70, 73, 75, 79, 80, 81, 82, 83, 84, 99, 101).

Judge Bowie even denied Mr. Hupp's motions to compel that were ***uncontested*** (DK# 101, 107).

Mr. Hupp could not even get a simple accounting of his current loan or the amount outstanding. The exact amount of the loan therefore could not be given at trial, allowing only estimates and guesses. This act violated basic procedural due process rights.

      D.    <u>Judge Bowie Erred As A Matter Of Law By Granting All (100%) Of ECMC's Discovery No Matter How Irrelevant or Prejudicial- Or Barred By The Federal Rules Of Evidence</u>

In a particularly egregious act Judge Bowie granted ECMC's entire discovery, 100%, much of which was irrelevant and prejudicial or is barred under the Federal Rules of Evidence. Such discovery requests by ECMC included speculation as to future events ("Will you receive any inheritances in the future?"). (DK# 56, 65, 74, 84). Because Judge Bowie would not enforce any case management, ECMC waited six (6) full months after they had served their discovery request to file their motion to compel. This act violated basic procedural due process rights.

      E.    <u>Judge Bowie Erred As A Matter Of Law By Allowing Multiple Extensions Of Time To USA- Causing Unnecessary And Prejudicial Delay To The Case</u>

Judge Bowie, Judge Hayes and Judge Meyers all granted USA extensions of time on four (4) different occasions. (DK# 64, 66). These acts included an *ex parte* motion for an extension of time to file a reply brief to Mr. Hupp's Summary Judgment Motion just four (4) working days prior to the motion. (DK# 89, 91). Judge Bowie granted this *ex parte* motion for extension of time despite the fact USA had ten (10) weeks to prepare for Mr. Hupp's motion or *timely* ask for

the second extension of time (not just four (4) working days prior to the hearing after hotel and car arrangements had already be made and paid for by Mr. Hupp). This act violated basic procedural due process rights and cost hundreds of dollars in prepaid hotel accommodations and car rentals.

F.    Judge Meyers Erred As A Matter Of Law By Engaging In *Ex Parte* Communications With USA

One of the most serious violations engaged in by the court involved Judge Meyers Courtroom Deputy, Ms. Marcia Pearson, contacting USA's attorney Mr. John Reed Clay Jr. *ex parte* to get his approval of the Summary Judgment Motion date Mr. Hupp had requested. Ms. Pearson did not disclose this to Mr. Hupp or in any other way seek Mr. Hupp's input. When the date did not meet with Mr. Clay's approval Ms. Pearson moved it back three (3) weeks to purely accommodate Mr. Clay without regard to Mr. Hupp, indeed without even contacting or attempting to clear the new date with Mr. Hupp and once again delaying the summary judgment motion. (DK# 155).

This was the basic method of operation of the bankruptcy court the entire case, allowing USA or ECMC to run roughshod over Mr. Hupp on virtually any requested motion, while blocking and denying virtually all motions Mr. Hupp put forth. This act violated basic procedural due process rights.

G.    Judge Meyers Erred As A Matter Of Law By Denying To Grant Class Action Certification, Declatory And Injunctive Relief, And To Interplead U.S. Secretary Of Education

Mr. Hupp, in an omnibus motion, requested that his case be granted class action certification based on the similarities between him and virtually all other student loan debtors, requested declatory and injunctive relief and requested to have U.S. Secretary of Education, Margaret Spellings, to be added as a named defendant. (DK# 123, 124). This motion for class action certification was supported by the declarations of seven (7) different student loan debtors with the exact same problems of Mr. Hupp. (DK# 127, 134, 135, 136, 137, 138, 139, 157).

Despite the overwhelming evidence supporting the granting of the above requests, Judge Meyers denied the motion. (DK# 170). This act violated basic procedural due process rights.

## 2. **CONSTITUTIONAL VIOLATIONS**

The constitutional issues presented are the most important part of this case and will be devoted the most amount of discussion in this brief. These constitutional issues are both unique in their application to student loans, and also in the number of challenges being made. USA has acknowledged this fact. (DK# 110).

Mr. Hupp suggests the court read all of the briefs he submitted supporting his summary judgment motion in their entirety to fully comprehend the constitutional arguments. (DK# 52, 54, 75, 83, 103, 120, 158).

A.    The Trial Court Erred As A Matter Of Law In Not Using A "Strict Scrutiny" Standard Of Review In Applying The Constitutional Challenges *Infra*

When the "basic necessities of life" are at stake, the United States Supreme Court has held that a **"strict scrutiny"** level of review should be applied. The "basic necessities of life" of life include food, clothing, shelter and medical care. Mr. Hupp suggests that basic transportation should also be included in the modern age. *See* Shapiro, Commissioner of Welfare Of Connecticut v. Thompson, 394 U.S. 618 (1969). (DK# 54).

In Shapiro, the United States Supreme Court, in striking down a Virginia poll tax, held that "wealth" was a "suspect" class and that "...the "compelling interest" test is applicable because the result of the classification may be to deny the appellees "food, shelter and other necessities of life...". *Underline added.* These are all factors that apply in the present case. (DK# 52).

B.    The Trial Court Erred As A Matter Of Law By Finding Title 11 U.S.C. § 523(a)(8) And Title 20 Code of Federal Regulations § 1091a Did Not Violate The Equal Protection Clause Of The Constitution By Not Using A "Strict Scrutiny" Standard Of Review In Applying The Equal Protection Clause

Race is always the paradigmatic example of a "suspect" class, and will always receive the Strict Scrutiny level of review. A valid and reliable demonstration of a disproportionate impact on a specific race with a legislative intent for the discrimination will always receive a Strict Scrutiny level of review, *even* if the statute in question is race neutral on it's face. (DK# 52).

Title 11 U.S.C. § 523(a)(8) and Title 20 Code of Federal Regulations § 1091 as administered, are discriminatory when compared to other government loan programs and the collection of taxes. By applying very harsh and inflexible terms/laws to government student loans, as discussed *infra*, the government imposes a disproportional financial impact on minorities. In contrast to student loan laws affecting minorities, the government allows much more lenient terms for other government debts, such as Internal Revenue Service ("IRS") tax debts, Small Business Administration ("SBA") business debts and Farm Aid ("FA") farm debts which flow mainly to white, Anglo-Saxon recipients. That shows intent to treat minorities, in the administration of collecting government debts, in a far harsher manner than non-minority America. These laws therefore are unconstitutional (even though the statutes are race neutral on their face) in application. *See* Yick Wo v. Hopkins, 118 U.S. 356 (1886). (DK# 52).

The United States General Accounting Office ("GAO"), **in 1997,** published default rates for 98 of the 104 Historically Black Colleges and Universities ("HBCU")[1] in a report titled;

> "Student Loans, Default Rates at Historically Black Colleges and Universities, Report to the Ranking Minority Member, Committee on Economic and Educational Opportunities, House of Representatives".

The study found that the default rate of the HBCU's were 21.1 percent, while the default rate for non-HBCU's were a modest 7.2 percent. HBCU's are defaulting at a rate 200 percent higher than other colleges and universities. The impact of Title 11 U.S.C. § 523(a)(8) and Title 20 Code of Federal Regulations § 1091a therefore greatly affects and disadvantages minority populations at a FAR HIGHER rate than non-minority America. Since the penalties and fees of Title 20 Code of Federal Regulations § 1091a are draconian in nature with no relief whatsoever, including bankruptcy. Minorities are suffering at a far higher degree with much higher penalties,

---

[1] United States General Accounting Office, Report No.: GAO/HEHS, 97-33. (DK# 52).

fees and costs-especially compared to IRS, SBA and other government loan programs where discounting the principle, penalties, fees and costs, up to 70% and more, is prevalent. *See* IRS Offer in Compromise. The IRS also offers very liberal amounts of income to be dedicated to "necessities of life", such as housing[2], transportation[3] and food[4] before income is garnished or levied for tax debts.

Variables associated with higher student loan default rates include being African American or American Indian. *See* Volkwein, J. Fredericks et al. 1998, *Factors Associated with Student Loan Default Among Different Racial and Ethnic Groups*[5]. (DK# 158)/

Other studies found that African American's default at a rate 11.7 percent higher than other population groups, which would prove up the default rates the GAO study documented. *See* Flint, Thomas A. 1997, *Predicting Student Loan Defaults*[6]. Particularly salient in the application of student loan default rates among minorities is the fact that minorities have a harder time getting and maintaining suitable employment, with unemployment playing a major factor in causing default, thereby preventing repayment of student loans. *See* Volkwein, J. Fredericks, and Alberto F. Cabrera1998, *Who Defaults On Student Loans? The Effect of Race, Class and Gender on Borrower Behavior*[7]". (DK# 158).

Given the above listed facts, it is not surprising that borrowers who experienced unemployment showed an 83 percent increase in student loan default rates. *See* Woo, Jennie H. 2002, *Factors Affecting the Probability of Default: Student Loans in California*[8]. Since minorities have higher unemployment rates than non-minorities, they obviously default on student loans at a higher rate. (DK# 158).

Unemployment is a common factor in defaulting on a student loan, and of course not limited to minorities. One study found that 83 percent of proprietary school borrowers, and 74

---

[2] See IRS form California-Housing and Utilities Allowable Living Expenses. (DK# 158, Ex. #1).
[3] See IRS form Allowable Living Expenses for Transportation. (DK# 158, Ex. #2).
[4] See IRS form National Standards for Allowable Living Expenses. (DK# 158, Ex. #3).
[5] Journal of Higher Education 69 (2), 206-37. (DK# 158).
[6] Journal of Higher Education 68 (3), 322-54. (DK# 158).
[7] In *Condemning Students to Debt: College Loans and Public Policy*. ed. Richard Fossey and Mark Bateman. (Editors) Teachers College Press. Teachers College, Columbia University, 1998. (DK# 158).
[8] Journal of Financial Aid 32 (2), 5-25. (DK# 158).

percent of two-year school borrowers stated that being unemployed was the major reason for student loan default. Minorities predominantly attend proprietary and two-year schools. *See* Dynarski, Mark 1994, *Who Defaults On Student Loans? Findings From the National Postsecondary Aid Study* [9]. (DK# 158).

But underemployment with low wages also contributes greatly to student loan default. Having an adequate disposable income is a necessary condition for honoring the terms of a student loan. Minorities are at the highest risk of underemployment. *See* Flint, Thomas A. *supra*. (DK# 158).

Based on these facts, race is inexplicably intertwined with higher default rates on student loans, resulting in a higher percentage of minorities being subjected to the inflexible and draconian repayment costs, penalties and fees thereby violating the equal protection clause of the Constitution. Strict Scrutiny Review should therefore be applied.

In addition, Expert Witness Alan Collinge submitted a detailed and exhaustive study proving up the equal protection clause violations in his Expert Witness Report dated November 26, 2007, (DK# 169), which stated;

> The United States Department of Education, from their very own data, provides undisputed and irrefutable proof that the true and actual student loan default rates, viewed on a longitudinal basis, are disproportionately affecting African American and Hispanic students at a far higher percentage than White students, with an undisputed ten (10) year student loan default rate of African-Americans at 39%, Hispanics at 17.2% and Whites at 6.9%.

> Based on these facts the Bankruptcy Court should strike down Title 11 of the United States Code § 523(a)(8) and Title 20 of the Code of Federal Regulations § 1091a as unconstitutional due to their disproportionately negative impact on African American and Hispanic students.
> The National Center for Education Statistics ("NCES")[10], located within the U.S. Department of Education and the Institute of Education Sciences, is the primary federal entity for collecting and analyzing data related to education.

---

[9] Economics on Education Review 13 (1), 55-68. (DK# 169).
[10] The National Center for Education Statistics, 1990 K Street, NW, Washington, D.C. 2006, USA, Phone: (202) 502-7300, http://nces.ed.gov/index.asp. (DK# 169).

NCES has documented and detailed a ten (10) year longitudinal study of student loan borrowers, including those who have who defaulted on their loans. The study was released in June, 2006[11]. This study is in contrast to the 4.9% default rate commonly referenced by United States Secretary of Education Margaret Spelling[12].

The problem with the U.S. Department of Education's reported default rate, which they refer to as the "cohort default rate", is that it only tracks borrowers for the first two (2) years after graduation. That limited two (2) year time frame is then calculated as an overall percentage to give a number to the borrowers in the cohort who default on their loans within those first two years of repayment, divided by the total number of borrowers in the cohort. In short-this time limited methodology skews towards a much lower default rate because of the limited time frame in which the students are tracked- two (2) short years directly after graduation.

But new facts show, under the June 2006 report by the U.S. Department of Education's own NCES, that student loan defaults are a far larger problem for students of color.

This NCES report was further refined by Education Sector[13] Policy Analyst Erin Dillon ("Ms. Dillon")[14] using the NCES's Data Analysis Systems ("DAS") Application/Analysis Program[15]. The DAS program allows a party to do their own analysis of data from NCES studies. The NCES website provides; 1) public access to education survey data collected by the U.S. Department of Education, *and* 2) the ability to analyze reports about education policy issues. Ms. Dillon has in fact used this data to analyze student loan default rates among races in her

---

[11] Longitudinal study done by NCES, Susan P. Choy and Xiaojie Li, "*Dealing With Debt: 1992–93 Bachelor's Degree Recipients 10-Years Later*", (Washington, D.C., National Center for Education Statistics, June 2006), http://nces.ed.gov/pubs2006/2006156.pdf. (DK# 169).

[12] U.S. Department of Education Press Release, September 10, 2007. (DK# 169).

[13] Education Sector is an independent education policy think tank devoted to developing innovative solutions to the nation's most pressing educational problems. They are nonprofit and nonpartisan and both a dependable source of sound thinking on policy, and an honest broker of evidence in key education debates throughout the United States. Education Sector, 1201 Connecticut Ave., NW, Suite 850, Washington, D.C., Phone: (202) 552-2840 http://www.educationsector.org/. (DK# 169).

[14] Erin Dillon, Policy Analyst at Education Sector. edillon@educationsector.org At Education Sector, Ms. Dillon was responsible for designing, implementing, and assisting with a variety of research and analysis projects, with a focus on quantitative data sets. Prior to joining Education Sector, Ms. Dillon was a research associate with the Beginning with Children Foundation in New York, N.Y. At the Foundation, she managed a research project examining the academic achievement of charter school students and assisted with a college preparatory program for high school students. Ms. Dillon received her master's degree in Social Sciences in Education at Stanford University in 2004, where she focused on education research and policy, and received a B.S. in Psychology at the College of William and Mary. Previously she gained extensive experience with quantitative research and analysis as a study coordinator at Johns Hopkins University. (DK# 169).

[15] NCES's Data Analysis Systems ("DAS")  http://nces.ed.gov/das/. (DK# 169).

Paul Hupp's Opening Brief On Appeal

October 23, 2007 study "Hidden Details: A Closer Look at Student Loan Default Rates"[16]. (DK# 169, Ex. A.)

The NCES study did not analyze student loan default rate by race, so Ms. Dillon did. Ms. Dillon, using the NCES's DAS application, produced the following true and actual student loan default rates by race, using the NCES's own statistics;

1- African-American: 39%
2- Hispanic: 17.2%
3- White: 6.9%

Ms. Dillon created a specific analysis table and covariance analyses using the DAS application to develop the above default rates based on race. *See* "Chart 3" of Ms. Dillon's study.

The statistics clearly show that African American and Hispanic students have a substantially higher student loan default rate. Therefore these two (2) minority groups also suffer a substantially higher, and disproportionate, impact from the draconian laws applied under Title 11 of the United States Code § 523(a)(8) and Title 20 of the Code of Federal Regulations § 1091a.

In addition, since the NCES study only tracked a ten (10) year period resulting in a 39% student loan default rate among African American students, there can be little doubt that the true and actual student loan default rate of African American students is over 50%, possibly much higher.

The fact of the matter is the study is still underestimating ALL student loan default rates because it is limited to just 10 years. Just as the 10-year default rate is substantially higher than the 2-year default rate the U.S. Department of Education uses, so too would 15 year, 20 year and 25-year student loan default rates. In addition student loan borrowing has increased substantially since the 1993-2003-time period, which the NCES study tracked. That too would have an exponential impact on true and actual student loan default rates.

Based on the facts set forth by Mr. Collinge, including the verified and independent studies showing the disproportional impact of defaulted student loans on minorities and people

---

[16] Education Sector, "Hidden Details: A Closer Look at Student Loan Default Rates", by Erin Dillon, October 23, 2007 http://www.educationsector.org/analysis/analysis_show.htm?doc_id=559757. (DK# 169).

Paul Hupp's Opening Brief On Appeal

1   of color, *intentional and forced defaults* in some cases, the laws violate equal protection and

2   should be struck down.

3          C.     The Trial Court Erred As A Matter Of Law In Not Finding Title 11 U.S.C.
                   § 523(a)(8) And Title 20 Code of Federal Regulations § 1091a And

4                  Supporting Laws Unconstitutional Using Even A "Rational Basis" Review

5

6         In the alternative, even if a lower standard of review were to be used, such as "<u>Rational</u>

    <u>Basis</u>", the government has not met their burden for the vast, far-reaching and predatory laws

7   affecting student loans.

8         In order for a <u>Rational Basis Review</u> to hold up to the very limited burden that is needed

9   to sustain its goal, there must be a rational basis for the law. That <u>Rational Basis</u> must be

10  established through hearings, debate and <u>evidentiary support</u>, showing that there is indeed a

11  reason and need for the law. The standard is low, but there is a standard. The evidentiary

12  support must be valid and reliable.

13        The party challenging a <u>Rational Basis Review</u> must show there is no legitimate reason

    for the law, OR, the means are NOT rationally related to the goal sought.

14        Under Title 11 U.S.C. § 523(a)(8) and Title 20 Code of Federal Regulations § 1091a, the

15  means are NOT rationally related to the goal sought. The laws are overly broad and the over

16  broadness is not supported by valid or reliable evidence. Indeed the only evidence that USA *may*

17  have shown is *anecdotal* at best. That is not nearly enough to enact and apply the overly broad

18  laws (as they are currently being applied).

19        When Title 11 U.S.C. § 523(a)(8) was modified in 1998 removing bankruptcy discharge

20  after the debt had been in default for a period of seven (7) years, there was no statistical or

21  <u>evidentiary evidence</u> submitted by the Congress to support a <u>Rational Basis Review</u> for making

    such a change. Congress simply removed the seven (7) year default period for automatic

22  discharge and enacted the "Undue Hardship" test as the ONLY way to discharge student loan

23  debt in bankruptcy. The *only* evidence the Congress heard were *anecdotal* examples of students

24  such as Maria Brunner (of the infamous "<u>Brunner</u> Test") who filed for bankruptcy discharge

25  right out of college.

The Congress, based on *anecdotal* evidence only, took a sledgehammer approach to a problem that required a fly swatter. The means of the law were not <u>rationally related</u> to the goals sought by the Congress. (DK# 158).

Without evidentiary support, the draconian measures the Congress took in the 1998 bankruptcy revisions of not allowing student loan discharge in bankruptcy except under the "Undue Hardship" test are very vague, ambiguous and overbroad. The Congress went far beyond the means necessary for stopping abusive discharge of student loans in bankruptcy, buttressing and proving up the over broadness claims. (DK# 158).

The Congress essentially required a $50,000+ dollar legal/adversary proceeding of indigent student loan debtors, students who could never afford such legal fees if they were indigent, and if they could afford those fees they would never qualify for the discharge. The Congress essentially completely shut down ALL student loan discharges in bankruptcy with the 1998 revisions. As absolute proof, <u>Mr. Hupp's adversary proceeding for his student loan discharge was the ONLY student loan discharge filed in the entire Southern District during the 2006 calendar year, out of four (4) million total people in the Southern District.</u> (DK# 158: P 5-6).

**Expert witness Mark Kantrowitz** has specifically stated in his expert witness report (U.S. Bankruptcy Code, Title 11 U.S.C. § 523(a)(8), as amended by section 220 of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), P.L. 109-8, effective October 17, 2005) that the 2005 provisions to the Bankruptcy Code that prevented private student loans from discharge was not debated at all in the Congress and no one knows how the provision was even inserted into the bill. Mr. Kantrowitz summarized his expert finding of fact as follows;

> To summarize my proposed testimony, the primary public policy justification for extending an exception to discharge to qualified education loans is <u>unfounded</u>, as it did <u>not</u> lead to a significant increase in the availability of private student loans. Please review my detailed and comprehensive attached report, *Limitations on Exception to Discharge of Private Student Loans*, Kantrowitz, Mark; FinAid, August 19, 2007, for a more in-depth analysis. Attached to, made a part of and by this reference incorporated into this Expert Witness Report as Exhibit B. (DK# 156, 161).

D.    The Trial Court Erred As A Matter Of Law In Finding No Statute Of
      Limitations For Student Loans Constitutional, Violating "Mutuality of
      Contract" And Substantive Due Process Of Law

Student loan debtors do not have unlimited time to file legal claims related to those who

interfere with their student loan obligations (such as the Commission), and therefore under

mutuality of contract there must be statute of limitation limits on when a student loan holder can

file suit on a student loan contract, as well as when a debt is no longer enforceable. Mutuality of

contract is a two (2) way street.

Allowing a private company/loan holder to have no time limits on enforcing their rights

is unconstitutional.  In addition to the unconstitutional factor, this unlimited time to enforce

rights does not apply to the student borrower, who does have time limits, very short ones, to sue

government actors who engage in misconduct.  A private actor cannot wait indefinitely to

enforce their rights against the government or a government actor, and under the contract

doctrine of "mutuality of contract" the government and its actors must be held to the same

standard.

No civil debt in America has no statute of limitation except student loans, and in fact the

doctrine of "laches" applies far sooner than the statute of limitation ever would, so why does a

student loan holder get away with having no statute of limitations or laches?

Having no statute of limitations is unconstitutional, violates "mutuality of contract" and due

process.  For those reasons Title 11 U.S.C. § 523(a)(8) and Title 20 Code of Federal Regulations

§ 1091a, should be struck down. (DK# 158: 8-9).

E.    The Trial Court Erred As A Matter Of Law In Finding The Term "Undue
      Hardship" In 11 U.S.C. § 523(a)(8) Constitutional, When It Is Vague,
      Ambiguous And Overly Broad

In 1998 Congress removed the seven (7) year default period for automatic discharge of

student loans in bankruptcy under Title 11 U.S.C. § 523(a)(8), and left the "Undue Hardship"

test as the only way to discharge student loan debt in bankruptcy.  Congress never defined the

term "Undue Hardship", and that error has caused numerous problems with the interpretation of

discharging student loan debt.  There is absolutely no way to determine before filing bankruptcy whether any person can meet the "Undue Hardship" test, because no one knows what it is, including judges. (DK# 158).

This is the quintessential, classic example of a vague, ambiguous and overly broad law. No one can figure out what the "Undue Hardship" term encompasses, so the parties must engage in costly and time-consuming litigation. Litigation that virtually no indigent debtor can afford. Litigation that will produce100 different results from 100 different judges.  The judges don't know the meaning of the test, the bankruptcy lawyers don't know the meaning and certainly the student loan debtors don't know the meaning.  As a result, nearly all student loan debts filed in bankruptcy are denied, which buttresses the fact that the law is being applied in an overly broad manner. (DK# 158).

It is not the job of the courts to try to figure out and guesstimate what the Congress meant when they said only students who meet the "Undue Hardship" test could have their student loans discharged under 11 U.S.C. § 523(a)(8).  The definition of "Undue Hardship" lies solely with the Congress, and until they clarify what they meant by the "Undue Hardship" test, 11 U.S.C. § 523(a)(8) should be struck down.  (DK# 158: P 7).

F.    The Trial Court Erred As A Matter Of Law In Not Finding The Penalties Allowed On Defaulted Student Loans Under 20 U.S.C. § 1091a "Unconscionable"

When a student loan goes into default, Title 20 Code of Federal Regulations § 1091a allows the FRONT-loading of penalties and fees as high as 40%. Even if you were to immediately get your loan out of default within a month, the FRONT-loaded penalties and fees remain, and they COLLECT interest from day one (1), compounded daily of course.

This would be illegal under both federal[17] and state[18] debt collection laws, except Congress exempted Title 20 Code of Federal Regulations § 1091a from the fair debt collections act. More proof that the Title 20 Code of Federal Regulations § 1091a is "unconscionable".

The penalties and fees applied under Title 20 Code of Federal Regulations § 1091a, to those who can least afford to pay them, is the quintessential, classic example of "unconscionable". As such, Title 20 Code of Federal Regulations § 1091a should be struck down. (DK# 158: P 8).

G.    The Trial Court Erred As A Matter Of Law In Finding Laws That Allow Excessive Penalties, Wage Garnishments Without A Court Order, Tax Refund Interceptions And "*Ex Post Facto*" Laws Constitutional

Under The Contracts Clause of the United States Constitution, *Ex Post Facto* laws are unconstitutional. Specifically, *Ex Post Facto* laws are prohibited in federal law by Article 1, section 9 of the U.S. Constitution. The *Ex Post Facto Law* clause applies to the federal government through the Fifth Amendment. See Bolling v. Sharpe, 347 U.S. 497 (1954).

Title 20 Code of Federal Regulations 1091a and supporting laws were all put into place AFTER Mr. Hupp took out his student loans in 1986, 1987 and 1988.

H    The Trial Court Erred As A Matter Of Law In Not Discharging the Student Loan Debt Because Of The Government's "Unclean Hands" And Knowingly, Willfully And Intentionally Frustrating The Student Loan Contract

The government's "unclean hands" in the obstruction of Mr. Hupp paying off his student loan debt, specifically the Commission's willful and intentional tortious conduct, should enjoin it from preventing discharge. (DK# 52, 53, 195).

---

[17] *See* Fair Debt Collection Practices Act, 15 U.S.C. § 1692- can only charge *actual* collection costs, no front-loading of unearned costs. (DK# 158).
[18] *See* California Rosenthal Fair Debt Collection Practices Act- California Civil Code § 1788- can only charge *actual* collection costs, no front-loading of unearned costs. (DK# 158).

I.    The Trial Court Erred As A Matter Of Law In Finding The Penalties And Fees Applied To Student Loans Do Not Violate The 8th Amendments Ban On Excessive Fines

Student loan default fees have absolutely no relationship to the actual costs associated with such a default, and are therefore "grossly disproportionate". When a borrower defaults on a student loan 40% is automatically added to the debt-irrespective of the actual costs associated with such a default. Defaulted student loans of $1,000 dollars and $100,000 dollars both get the same amount of collection enforcement, but the amount added to the $1,000 debt is only $400 dollars, while the amount added to the $100,000 debt is $40,000 dollars-a 100 fold increase for the exact same collection actions. (DK# 103).

There is no statute of limitation on these fines, just as there is no statute of limitations on the student loan itself, allowing the costs to go on forever (or until the borrower dies) if they cannot pay the debt. This is true even if the borrower has done everything in their power to pay back the loan. This is true even if the Government is the cause for non-payment of the loan. This is true even if the debt holder, such as Sallie Mae, is the cause for non-payment of the loan.

Because these fees are "grossly disproportionate", combined with the fact that these fees cannot be negotiated or discharged in any matter whatsoever, the Eighth Amendment's Ban on Excessive Fines is violated. (DK# 103).

1.    "Grossly Disproportional" Penalty Violates The 8th Amendment's Excessive Fines Clause

Starting in 1993, the United States Supreme Court ruled unanimously in a pair of cases that forfeitures and fines (whether imposed in either a criminal or civil setting) were subject to the Eighth Amendment's Excessive Fines Clause[19]. The rulings in these two (2) cases, Austin v. United States, 509 U.S. 602 (1993) and Alexander v. United States, 509 U.S. 544 (1993), set no

---

[19] The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Constitution, Amendment 8.

specific guidelines on how to determine when such a fine was "excessive", and therefore

unconstitutional.  The Excessive Fines Clause "limits governments power to extract payments,

whether in cash or in kind, 'as punishment for some offense.'"  Austin at 609-610. Clearly,

excessive fines cannot be used as a punishment, yet that is exactly what the student loan debt

holder (Sallie Mae) today is doing. (DK# 103).

The United States Supreme Court refined and clarified what was to be deemed in

violation of the Eighth Amendment's Excessive Fines clause in United States v. Bakajian, 524

U.S. 321 (1998).  In Bakajian the Supreme Court held that a "grossly disproportional" penalty

violated the Eighth Amendment's prohibition against "excessive fines".  Bakajian was a

forfeiture case where Mr. Bakajian, who was a Syrian immigrant to the United States, tried to

smuggle $357,144 dollars in cash from the legal profits of two (2) gas stations he owned out of

the United States to repay a debt to the friend who had helped him get started in the United

States. Federal law required anyone leaving the country with more than $10,000 in cash to report

it. Mr. Bakajian's money was legally earned, and the only crime Mr. Bakajian committed was

not reporting it, a minor infraction.  The United States tried to confiscate ALL of the money for

the sole violation of not reporting it. Justice Thomas wrote that the forfeiture in the case

amounted to punishment and "serves no remedial purpose" other than it was "designed to punish

the offender", therefore it was subject to the Excessive Fines Clause, and did not allow the

forfeiture.

Justice Thomas acknowledged that the Court had never before determined what

constitutes an excessive fine and found no guide in the text of the clause or its history.  Justice

Thomas therefore turned to a standard the Court had used in applying the Eighth Amendment's

Prohibition against Cruel and Unusual Punishment. Thomas stated, "If the amount of the

forfeiture is grossly disproportional to the gravity of the defendant's offense, it is

unconstitutional".  Thomas further refined how to administer the Eighth Amendment's Excessive

Fines Clause by applying the law in a manner that " involves solely a proportionality

determination".  The simple application of Bakajian is to compare the offense to the penalty-and

make sure they are proportional.  The fines, fees and penalties in student loans are not

proportional, and would in fact be illegal *but for* the special protections the student loan industry bought, implemented and paid for through the Congress. (DK# 103).

### 2. 40% Penalties Added To Defaulted Student Loan Debt Is "Grossly Disproportional"

Now compare <u>Bakajian</u> to plaintiff's case. Plaintiff borrowed approximately $7,000 in 1986, 87 and 88. Plaintiff then applied at numerous school districts and was offered employment that was more than four (4) times the student loan debt. Government then intentionally interfered with that employment-a civil crime. Plaintiff made loan payments when he was able to in 1989 and 1992. Plaintiff was paying off his debts in 1997 when the Government yet again intentionally interfered with his teaching employment-more civil crimes. (DK# 103).

Then compare in 1997 how the loan holder refused to grant any more forbearances or deferments on plaintiff's loan, intentionally forcing a default so loan holder United Student Aid Funds, Inc. could add 40% of the debt in unearned and fraudulent penalties-much how the government tried to steal <u>Bakajian</u> hundreds of thousands of dollars over a minor infraction.

To fully understand how "grossly disproportional" these fees are, one simply has to compare the $7,000 plaintiff borrowed and the $70,000 dollars plaintiff currently owes today on a 30 year amortization schedule;

30 year amortization schedule=$609.22/month payments x 360 months= $219,320.36

The loan payments (if they could be made) of 609.22/month would exceed the amount plaintiff borrowed ($7,000) in a **single** year. That is "grossly disproportional", yet Judge Meyers does not mention it ONE TIME in his decision. Interesting ruling by Judge Meyers. (DK# 103).

It can be fairly inferred from the evidence in this case that student loan debt holders are *intentionally* forcing student loan debts into default so they can "jack up" the <u>penalties</u>. Plaintiff's case illustrates this situation perfectly. The student loan debtor simply has no recourse to negotiate, cancel or escape the student loan debt-even if the debtor lacks the basic necessities of life (food, clothing, shelter and healthcare). (DK# 103).

3.  The Internal Revenue Service Routinely Settles Intentional Tax
Cheating For 30% of   Face Value-Discounting Intentional
Criminal And Civil Crimes 70%

Particularly disturbing with regard to student loan debt is the fact that the Internal
Revenue Service ("IRS") routinely settles defaulted taxes at 30 cents on the dollar.  This is true
even when the defaulted tax is the product of intentional criminal conduct.  (DK# 103).

An example of such discounting of intentional tax cheating is the recently settled IRS
case against Merck & Company ("Merck"), settled in February 2007.  Merck is the largest
pharmaceutical company in the world and a Fortune 25 company.  From 1993 through 2006
Merck engaged in possible criminal and civil tax cheating-the amount in dispute totaling **$3.8
BILLION DOLLARS**.  Despite possible criminal and civil violations-the IRS settled with
Merck for 2.3 billion dollars.  A substantial discount on the outstanding debt. (DK# 103, Ex. #1-
IRS Press Release IR-2007-35 Dated February 14, 2007; and DK# 103, Ex. #2 -Herald Sun
Article Dated February 14, 2007). (DK# 103).

The question then becomes this, if a Fortune 25 company gets a tremendous discount on
criminal and civil tax cheating-then why does a destitute student loan debtor who lacks basic
necessities of life, who never engaged in any cheating whatsoever, be forced into a lifetime of
financial incarceration?  Why do they not get the benefits of one of the most profitable
companies in the world?  The answer is very simple. Because a destitute student loan debtor does
not have the ability to lobby/buy Congress. (DK# 103).

The real crime with Title 11 U.S.C. § 523 (a)(8) not allowing a person to be able to
secure the basic *necessities of life* is that it goes against USA's very own Internal Revenue
Service ("IRS") rules, which provide a "safety valve" for *necessities of life,* even if the person is
an INTENTIONAL tax cheat. For tax cheats who broke the law and engaged in felonious crimes,
the IRS offers an "abatement of penalties and interest"[20].

---

[20] See JK Harris and Company's "Help with IRS Penalties and Interest". (DK# 120, Exhibit #5).

In addition the IRS allows people facing financial difficulty the "Offer in Compromise"[21] option, intentional tax cheaters or not. The IRS has recognized that coming to some sort of a reasonable solution is in the best interests of all parties. If the IRS can allow compromises on the money/income that fuels the engines of the entire United States, the Department of Education can do the same thing. (DK# 120).

J.     Mr. Hupp Has Submitted Three (3) Uncontested "Expert Witness Reports" Backing Up His Constitutional Challenges

Mr. Hupp has provided the testimony of two (2) "Expert Witnesses" in three (3) "Expert Witness Reports". The reports were admitted uncontested, proving up his allegations that the student loan laws are overly broad and are not rationally related to their end goals. (DK# 118, 102, 105, 156, 161, 169).

**3.     LEGAL AND FACTUAL ERRORS APPLYING "UNDUE HARDSHIP" TEST**

The errors by Judge Meyers are both factual and legal and occur throughout his entire five (5)-page decision.

A.     Judge Meyers Erred As A Matter Of Law In Applying The Second Prong of The Three (3) Prong Brunner "Undue Hardship" Test

The errors by Judge Meyers in applying the second and third prongs of the "undue hardship" test, used for the discharge of student loans, were unsupported on both a legal and factual basis.

Judge Meyer's first erred as a matter of law in applying the second prong of the Brunner test. (DK# 197). The second prong of Brunner states that the debtor cannot pay the student loan back for a "significant portion of the loan repayment period". The test states, on it's face with no ambiguity, that the time frame is a **significant portion** of the repayment period. The test does

---

[21] See IRS Form 656 "Offer in Compromise". (DK# 120, Exhibit #6).

not state that the loan repayment is forever, or for 50 years, or 25 years or even 15 years. It says for a "significant portion of the loan repayment period". (DK# 51, PP: 18-19).

Judge Meyers the goes on to state, without any factual support that;

"Plaintiff has not provided any evidence of "exceptional circumstances" or "insurmountable barriers" that are strongly suggestive of his inability to repay the loan." (DK# 197, P: 4)

It appears Judge Meyers ignored <u>Nys</u>, *infra*, the most important student loan case since <u>Brunner</u>, cited in Mr. Hupp's brief.

Not only did Judge Meyers ignore, failed to mention or analyze the case, he literally did not apply a single factor of the <u>Nys</u> test to Mr. Hupp's situation. This is clear and convincing evidence of misconduct by "cherry picking" the facts to get the outcome the judge seeks.

In re <u>Nys</u>, 2006 U.S. App. Lexis 10409, 446 F.3d 938 (9th Cir. 2006) established a **<u>non-exhaustive</u>** list of factors to be considered when analyzing this prong, and such "additional circumstances" **need not be exceptional**. The list partially includes;

1. Serious mental or physical disability;

2. Lack of, or severely limited education; <u>Pena</u> at 1114;

3. Poor quality of education;

4. Lack of usable or marketable job skills;

5. Underemployment

6. Maximized income in the chosen educational field, and no other more lucrative job skills;

7. Limited number of years remaining in work life to allow payment of loan; <u>Brunner</u> at 396;

8. Age or other factors that prevent retraining or relocation;

9. Lack of assets, whether exempt or not, which could be used to pay the loan;

In re Nyes should also include (and have at the top of the *non-exhaustive* list) the following;

   1) Food;

   2) Housing;

3) Health care; and

4) Transportation.

Without these four (4) basic necessities of life, a debtor's future ability to earn income is compromised. As a matter of <u>public policy</u> these factors should be met first and foremost, before payment of student loan debt, for they are the engine that drives the debtor's ability to continue to earn a living. Mr. Hupp uses social services for food; has no permanent housing which at times required him to live in his truck; has no health care and essentially never has had health care during his adult life; and Mr. Hupp's only transportation is a 1986 Nissan truck with over 300,000 miles on it, which has been non-operational since July 2004 when the clutch went out.

Virtually all of the factors on the non-exhaustive <u>Nys</u> list that are <u>applicable</u> to Mr. Hupp are met by him, and favor discharge. (DK# 52, PP: 19-20).

It also appears Judge Meyers must not have read the portions of the case where Mr. Hupp documented how he spent 16 years litigating against the Commission in court and battling their flat out falsehoods in trying to deny his teaching Clearance, the thousands of dollars he spent defending himself against the bogus charges, the decades he has lost of valuable work and income because of the false charges, the waste of time, money and resources he has spent in enrolling in two (2) teacher education programs that lasted over 1.5 years that are completely useless today, and trying to find a living wage job year after year with no success. How Judge Meyers missed that part of the case is open to speculation.

Judge Meyers then goes on to *imply*, with no factual support whatsoever, that because Mr. Hupp is seeking the legal remedy of the courts "rather than to seek gainful employment to repay his loans" he should not be allowed his discharge. That is a new one. If Mr. Hupp had not spent years in litigation to fight the Commission and their bogus lies to get his teaching Clearance then Judge Meyers would not even be able to use his wild statements, discussed *infra*, about substitute teaching work and pay. So Judge Meyer's statement that Mr. Hupp should not have "spent the last four years in litigation to avoid repaying these loans rather than seeking employment to enable him to make payments" is one of the most wild and legally unsupported statements in the record.

It is funny how Judge Meyers never mentions the forced intentional default of Mr. Hupp's student loan in his decision, forcing the loan to increase 10 fold. Or how Judge Meyers never ONCE IN HIS ENTIRE DECISION mentions how the Commission was the direct and proximate cause of the loan default. He completely omits any of the relevant facts of why the loan was in default and the circumstances leading up to the default.

The fact is Mr. Hupp not only "sought gainful employment", he secured gainful teaching job on numerous occasions, the first teaching job within three (3) months of graduating college, and had other teaching jobs that would have allowed him to pay back his loan, ***but for*** the government's tortious interference. And Mr. Hupp <u>would</u> have paid the loan back ***but for*** the intentional tortious acts of the Commission. Mr. Hupp tried for over 13 years, from 1987 through 2000, to secure a living wage job. He could not secure one, and the few jobs he did secure that would have led to a living wage and the ability to pay the student loan were damaged beyond repair by the government.

Judge Meyers then states the most factually baseless statement in his entire decision by stating (that Mr. Hupp):

> "He admits he can obtain substitute teaching positions at $105/day (or about $13.00 an hour), and has held other positions at a similar rate of pay. Even with these positions he could earn over $27,000 per year. If he continues with his present lifestyle , the loans could be repaid in fewer than five years". (DK# 197, P: 4).

Mr. Hupp has never made any such admission. The record not only does not support this wild statement, it is from another planet in the solar system. Mr. Hupp never made $105 per day, EVER, he never admitted he could get a substitute teaching position at a $13.00 hour rate of pay, and in fact it is impossible in the current educational and economic climate to secure a substitute teaching job anywhere in California without a clear credential and years of experience. Even if Mr. Hupp could get a substitute-teaching job, there is NO WAY he would make $27,000 per year. Substitute teaching positions are "<u>on call</u>", they do not work everyday, or even every week or every month, yet Judge Meyers takes a bogus and factually unsupported $105 per day job (actual pay = $50-$85 per day, part time on call job) and extrapolates it across 50 work weeks per year, a work schedule that is virtually non existent for a substitute teacher (essentially

a full time job with no vacations).  Even then the $27,000 "pie in the sky" pay rate Judge Meyers cites, *if true*, would total less than $18,000 per year in take home pay, which would not even cover basic living expenses, much less pay down a $75,000 student loan (which started out as a $7,300 student loan).

The 10th Circuit has also weighed in on the second prong under <u>Educational Credit Management Corporation v. Polleys</u>, 356 F.3d 1303 (10th Cir. 2004). In <u>Polleys</u> the 10th Circuit clarified how the trial court should decide if the second prong is met.  A "realistic look must be made into the debtor's circumstances and the debtor's ability to provide for adequate food, shelter, nutrition, health care and the like" and "**courts should base their estimation of a debtor's prospects on specific articulable facts,** not unfounded optimism, **and the inquiry into future circumstances should be limited to the foreseeable future, at most over the term of the loan.**" <u>Polleys</u> at 1307, emphasis added.   (DK# 53, P:21). This refutes Judge Meyers "pie in the sky" claims, and also proves up the fact that the second prong of the <u>Brunner</u> test should be looked at over the "term of the loan" only.

The wild, crazy manipulation engaged in by Judge Meyers is why this law, and the laws supporting it, should be struck down.

The "undue hardship" test can be manipulated to deny any student loan debtor, on any amount of student loan debt, for any reason the trial judge fantasizes about.  The test should be renamed the "impossible hardship" test, because bankruptcy judges can manipulate the so called "undue hardship" test to deny any student loan discharge no matter how valid the discharge is by using bogus, factually unsupported and wild claims, like Judge Meyers has here.

Mr. Hupp meets the *second prong* based upon the amount of time he has been unemployed or under employed.  Mr. Hupp graduated from college in May 1987 and had a teaching position secured within 90 days at LAUSD, which paid more than four (4) times ($28,000) the amount Mr. Hupp borrowed ($7,000).  The California Commission on Teacher Credentialing instructed LAUSD not to hire Mr. Hupp. Mr. Hupp completed all of his classroom teacher education courses by completing an accelerated teacher education program during June and July 1987.  This accelerated program was very expensive, academically challenging and

1  time consuming. These teacher education courses became useless after LAUSD revoked Mr.

2  Hupp's job offer. Mr. Hupp searched diligently for the next 10 years for gainful employment

3  that would enable him to meet basic living expenses in addition to paying his student loan. Mr.

4  Hupp could find no job that met even the very first requirement of meeting basic living expenses,

5  much less pay the student loan. Mr. Hupp finally was hired in 1997 as a teacher in two school

6  districts making a modest $50-$85 per day, on call. Mr. Hupp was able to pay basic living

   expenses and start payment towards his bills at this time only because he had help from his

7  family paying his housing costs. After working at both jobs for approximately eight (8) months,

8  the California Commission on Teacher Credentialing again interfered with both of these teaching

9  jobs and Mr. Hupp was again fired- from both jobs. Mr. Hupp was hired **again** by LAUSD in

10  August 1997 for a school teaching position set to start in late August 1997, when the California

11  Commission on Teacher Credentialing again interfered with the job and had him fired.

12  　　　Mr. Hupp was not able to find employment for the next three (3) years while he fought in

13  court for his teaching permit. (DK# 51, PP:17-18). Mr. Hupp clearly meets this prong of the

   Brunner test.

14

15  　　　　B.　　Judge Meyers Erred As A Matter of Fact When He Stated Mr. Hupp is
   　　　　　　　Relatively Healthy

16

17  　　　Judge Meyers made a false statement of fact when he stated in his order that Mr. Hupp
   was relatively healthy. (DK# 197, P: 2).

18  　　　Mr. Hupp has no health insurance and never has, is in need of tens of thousands of dollars

19  of both medical and dental care and this was documented at the court trial and in previously

20  submitted briefs. (DK# 109). The statement is not supported by any evidence in the record

21  whatsoever and is in fact a flat out lie and manipulation by Judge Meyers.

22  　　　　C.　　The Trial Court Erred As A Matter Of Law In Not Finding Medical And
   　　　　　　　Dental Care As Significant Factors In Discharging Student Loan Debt

23

24  　　　A debtor's health should take priority over any student loan obligation, if repayment of

25  the loan would interfere with health care or the ability to pay for health care. As Judge Gibson

   stated in Reynolds v. Pennsylvania Higher Education, 425 F.3d 526, 532-33 (8th Cir. 2005);

"Illness often affects both a debtor's ability to earn and her expenses; in such cases, factors affecting the debtor's health also have a financial significance. Where the evidence shows that financial obligations are likely to undermine a debtor's health, which in turn will affect the debtor's financial outlook, we think it entirely consistent with <u>Andrew</u> and <u>Long</u> to take such facts and circumstances into account. We will not adopt an interpretation of "undue hardship" that causes the courts to shut their eyes to factors that may lead to disaster, both personal and financial for a suffering debtor."

This is clear evidence that the courts should discharge student loan debt as an "undue hardship" when it obstructs a debtor from receiving or maintaining even *minimal* health care or health care insurance. Mr. Hupp has no health insurance of any kind and *any* illness at this age in his life could be a death sentence if he continues to have a student loan liability. Mr. Hupp currently has major dental problems, and has no money to pay for the required care to remedy the problems. In addition, Mr. Hupp has some medical problems relating to painful bone spurs as well as back problems. (DK# 51, PP:17-18, DK# 109).

D.    <u>The Trial Court Erred As A Matter Of Fact In Stating Mr. Hupp Had Significant Income To pay His Student Loan, Had A "Teaching Credential", Could Earn $105 Per Day As A Substitute Teacher, Gave No Information Regarding His Living Expenses</u>

Judge Meyer's stated Mr. Hupp had sufficient income to repay his student loan debt. (DK# 197, P:2).

Mr. Hupp has never made "sufficient income" in his entire life, whatever that vague and ambiguous term means. Indeed Mr. Hupp has only had one job his entire life that paid over $15,000 per year. Judge Meyers cites NO SUPPORT for this factually baseless statement. (DK# 197, P:2).

Mr. Hupp in 1997 paid down as much as he could on one credit card while he was working as a substitute teacher clearing approximately $900 per month in take home pay, for the period of January 1997 through August 1997. Mr. Hupp did not work on holidays, vacations, summer vacation or the end of the school year.

In addition, Mr. Hupp was in a teacher education program during this time period and was under an <u>educational deferment</u> of his loans, so they were not even due.

Judge Meyer's also made a factually baseless statement in stating Mr. Hupp has a "teaching credential". (DK# 197, P:2). Mr. Hupp has no teaching credential. He has a "30-Day Emergency Substitute Teaching Permit". The permit is basically useless unless a school district has an "emergency" need for teachers, that need must be documented to the state, and the state must approve a special *waiver*. Fully credentialed teachers, who in some cases have 10 years or more experience, are being laid off today, so the notion that there are not enough credentialed teachers to fill substitute positions and *waivers* are given out to school districts is another completely unsupported factual allegation by Judge Meyers.

Judge Meyer's also made yet another factually baseless statement in stating Mr. Hupp gave no information about his living expenses. In all bankruptcy proceedings the debtor MUST give a detailed statement of his living expenses under <u>Schedule J</u>. Mr. Hupp submitted this schedule with his *estimated* living expenses. They totaled over $1,980 per month. (U.S.B.C.-S.D.CA., Case No.: 06-00198, Schedule J). These estimated living expenses are over two (2) years old, extremely conservative and should be increased to reflect inflation and current cost of living expenses.

E.    <u>The Trial Court Erred As A Matter Of Fact In Stating Mr. Hupp Did Not Meet The Third Prong Of The Brunner Test-Good Faith Effort To Repay The Loan</u>

Again, Judge Meyer's statements that Mr. Hupp had sufficient income to pay his loan at anytime (he never did) and instead paid credit card debts that carried an interest rate 100% higher than the student loan (this was in fact true, but the loan was in an educational deferment and Mr. Hupp's housing payment was being provided by his family), and made only minimal efforts to repay the loan are not supported by the record at all. Judge Meyers "facts" are 100% false in applying the third prong of <u>Brunner</u>, and just more manipulation of the record.

Outside of four (4) lines in the final Discussion paragraph of his order (DK# 197, P:4), where Judge Meyers states the court is sympathetic to the current loan amount, there is virtually NO MENTION of the scam fees, inflated penalties and intentional forced default which increased the student loan more than 10 times what was borrowed. It is obvious this was not a

negligent omission by Judge Meyers, and even more obviously a lack of candor and honesty in the decision.  Nor does Judge Meyers make any mention whatsoever of the Commission's willful and intentional tortious acts that caused Mr. Hupp to lose his teaching positions ANYWHERE IN HIS ENTIRE DECISION.

Maria Brunner, of the infamous <u>Brunner</u> test, filed for bankruptcy three (3) weeks out of graduating from college, one (1) week before her first loan payment became due.  She did not make any effort to repay her loan, she did not ask for or file any requests for forbearance or deferment, or in any other way try to pay back her loans.  She just filed bankruptcy at the earliest possible moment she could on her student loan.  That is an abuse of the student loan program, and it is a far cry from the 10 years of deferments Mr. Hupp filed and was approved for.  Maria Brunner also never had a state teacher Commission tortiously interfering with her employment or a loan holder willfully and intentionally forcing her into default so they could jack up the bogus fees and penalties.

If this case were a Fortune 500  income and expense statement, and Judge Meyers was a C.P.A. doing an audit instead of presiding over a legal case, and Judge Meyers exaggerated the income (facts supporting no discharge) while minimizing the expenses (facts supporting discharge) Judge Meyers would be in prison.

Mr. Hupp can guarantee you this, if this happened to Judge Meyer's son or daughter, or Judge Bowie's CA licensed lawyer son Gavin Bowie, and they had a $100,000 law school loan and the State Bar interfered with their attempts to become licensed as lawyers the way the Commission interfered with Mr. Hupp becoming a teacher, and the loan holder willfully and intentionally forced them into default and tried to turn that $100,000 debt into a $17 million dollar debt ($100K x 171) like they have here with Mr. Hupp-I guarantee you Bowie and Meyers would be singing a different tune than the one here, and would not be engaging in the judicial misconduct or writing the garbage decisions that have come out of this case.

///

///

///

F.   The 25 Year William D. Ford Income Contingent Loan Program (Forever Loan) Should Not Be Considered In Any Student Loan Discharge Based On Tax Liability

One of the favorite arguments of ECMC and USAF (Sallie Mae) is to claim that student loan debtors should never be allowed to discharge a student loan in bankruptcy because they have the "option" of the William D. Ford Income Contingent Loan Program.  Never mind that the loan holders never mention this "option" until you are actually in bankruptcy, and the loan itself lasts for 25 years in addition to all the years you already have had your loan (if Mr. Hupp were forced into this program his $7,300 loan would last for a whopping 48 years).

In any event any when the Ford loan ends you are liable for all taxes on any amount discharged.  In Mr. Hupp's case his loan had a potential liability of $1,200,000.00+ (yes, that is one million, two hundred thousand plus dollars) on the Ford loan program, and if that amount were actually discharged Mr. Hupp would have a $540,000.00 tax liability.  Who knows, maybe the IRS has a 25-year William D. Ford Income Contingent *Tax* Program for unpaid tax liability.

The William D. Ford Income Contingent Loan Program should be barred from consideration in all student loan discharge cases based on tax liability.  (DK# 185).

**VI.**

**CONCLUSION**

The judicial misconduct in this case was vast, persistent and pervasive. It started with allowing an indispensable and essential party to transfer out of the case, it then carried over to the refusal to enter a Rule 16 scheduling order allowing Judge Bowie to turn a simple 5-month bread and butter student loan discharge case into a 25-month nightmare that almost caused Mr. Hupp to default on the case for lack of funds to continue.

The constitutional issues presented here are unique in many ways. First there are over ten (10) different constitutional issues, and second, the issues have never been applied to student loans. USA has admitted as much in their request to intervene.

These constitutional issues are rock solid defenses to these one sided, biased student loans, designed to put the poorest of the poor in our society into a life long cycle of loan payments. Payments that could require a 50-year repayment plan totaling over one million dollars

($1,000,000) on a face value loan of $7,300. That goes far beyond being unconstitutional. It goes far beyond the unconscionable test. It an outright scam.

The factual and legal errors made by Judge Meyers are easily documented and refuted. Indeed, his factual conclusions have absolutely no proof in the record at all. Judge Meyer's legal rulings are so far off established case law that one can only view his ruling as an intentional act to harm Mr. Hupp.

The bottom line is this, if the government wants to get paid back money they lend student borrowers they cannot willfully and intentionally interfere with their employment contracts, and they cannot allow their collection agencies/loan holders to force the student borrower in an intentional default so they can drive the loan costs into the stratosphere and turn a $7,000 loan into a $1,200,000.00 "forever loan".

If this case, based on the evidence presented, does not qualify as an "undue hardship" then there is in fact no such thing as an "undue hardship". Any case is now open to the subjective type of manipulation that both Judge Bowie and Judge Meyers have engaged in here.

For all of the above reasons, Mr. Hupp asks that this court find Title U.S.C. § 523(a)(8), Title 20 Code of Federal Regulations § 1091a and their supporting laws unconstitutional, strike them down, and discharge his student loan.

DATED: Friday, May 16, 2008

/s/ Paul Hupp
Paul Hupp
965 Hidden Oaks Drive
Beaumont, CA. 92223
Paulhupp@sdsualumni.org
(951) 769-1268
*Plaintiff-Appellant*
*In Propria Persona*