FILED

JUN 26 2008

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                    DEPUTY

Paul Hupp
965 Hidden Oaks Drive
Beaumont, CA. 92223
Paulhupp@sdsualumni.org
(951) 769-1268
*Plaintiff-Appellant*
*In Propria Persona*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| Paul Hupp, | ) Case No.: 08-cv-00414-H |
| | ) |
| | ) {BK No.: 06-00198-JM7} |
| | ) {Adv. Pro. No.: 06-90127-JM7} |
| | ) |
| Plaintiff, Appellant | ) **PLAINTIFF PAUL HUPP'S CLOSING** |
| | ) **BRIEF ON APPEAL** |
| vs. | ) |
| | ) |
| Educational Credit Management Corporation, | ) |
| Defendant, Appellee | ) |
| | ) |
| | ) |
| | ) |

# TABLE OF CONTENTS

I.    INTRODUCTION ..................................................................................1

II.   ARGUMENT-USA...............................................................................1

    1.    Strict Scrutiny Review Of Fundamental Constitutional Right ..................1

    2.    Race Is Always A "Suspect Class"..........................................................1

    3.    11 U.S.C. § 523(a)(8) Is Not Rationally Related To Legitimate Government Interest.........................................................................................2

    4.    Student Loan Contracts Must Have A Statute Of Limitations ................3

    5.    The Penalties Allowed Under Title 20 U.S.C. § 1091a Are Unconscionable ........4

    6.    Tortious Interference By Any Government Agency Violates Due Process ............5

    7.    The Term "Undue Hardship" is Vague, Ambiguous And Overbroad....................5

    8.    Collection Fees/Penalties Violate 8th Amendment's Ban On Excessive Fines .......6

    9.    Forced Default On Student Loan Debtors ...............................................7

    10.   Loan Holders Intentionally Refuse To Process FALSE CERTIFICATION Forms ........7

    11.   Title 20 U.S.C. § 1091a Is Retroactive Legislation ...............................8

    12.   Multiple Extensions Of Time And Ex Parte Communications Violate Due Process.........9

III.  ARGUMENT-ECMC ..........................................................................9

    1.    Plaintiff Complied With All Local Rules Including Discovery "Meet & Confer"..........9

    2.    Constitutional Arguments Can Be Raised At Anytime In The Trial Court.........10

    3.    ECMC Claims Plaintiff Engaged In "Name Calling & Outlandish Accusations" ........10

    4.    Procedural Due Process Must Be Followed.........................................10

5.    Mr. Hupp Had No Meaningful Chance To Be Heard Via Due Process Violations.................................................................11

6.    Judge Bowie Allowing USAF To Transfer Out Of Case Violated Due Process..................................................................11

7.    Denial Of Class Action Certification Was Improper.............................12

8.    ECMC Claims Mr. Hupp Offered No Evidence To Meet The "Undue Hardship" Test ......................................................12

9.    Second Prong Of Brunner Undue "Hardship Test" Was Met................12

10.   One Cannot Litigate A Student Loan Case *Pro Se* And Work At The Same Time ...........................................................13

11.   Plaintiff Not Only Sought Gainful Employment, He Was Gainfully Employed ..........................................................14

12.   ECMC Misstates Plaintiff's Professional Background..........................14

13.   Plaintiff's Legal Background Was Fully Vetted At Trial.......................15

14.   Mr. Hupp Would/Will Do Any Job That Pays A Living Wage..............15

15.   Goulet is Distinguished From Plaintiff's Case .....................................16

16.   USAF Intentionally Forced Mr. Hupp Into Default..............................16

17.   ECMC Claims Mr. Hupp Has A Claim Against The Commission ........16

18.   Mr. Hupp Is Not Eligible To Work As A Substitute Teacher ...............17

19.   Plaintiff Made Good Faith Effort To Repay Loan.................................17

20.   Judge Bowie And Judge Meyers Both Engaged in Misconduct............18

IV.    CONCLUSION.........................................................................18

Paul Hupp-08-cv-0414 H
Closing Brief on Appeal

# **TABLE OF AUTHORITIES**

**CASES**

Energy Reserves Group v. Kansas Power & Light,
   459 U.S. 400 (1983)......................................................................................8

Gideon v. Wainwright,
   372 U.S. 335 (1963)......................................................................................1

Goulet v. Educ. Credit Mgmt. Corp.,
   284 F.3d 773 (7th Cir. 2002) ......................................................................16

In Re Merchant,
   958 F.2d 738 (6th Cir. 1992) ........................................................................2

In Re Nys,
   U.S. App. Lexis 10409, 446 F.3d 938 (9th Cir. 2006)...........................13, 18

In Re Pelkowski,
   990 F.2d 737 (3rd Cir. 1993) ........................................................................2

Shapiro v. Thompson,
   394 U.S. 618 (1969)......................................................................................1

United States Trust Co. of N.Y. v. New Jersey,
   431 U.S. 1 (1977).........................................................................................8

**STATUTES AND OTHER REGULATIONS**

California Rosenthal Fair Debt Collection Practices Act, CCP § 1788............................5

Federal Rule of Bankruptcy Procedure 7016.................................................................12

Federal Rule of Civil Procedure 16 ..............................................................................12

Fair Debt Collection Practices Act, 15 U.S.C. § 1692....................................................5

Title 11 U.S.C. § 523(a)(8) ............................................................1, 2, 3, 4, 5, 6, 14

Title 11 U.S.C. §§ 101-1532 ..........................................................................................2

Title 20 U.S.C. § 1091a ...................................................................................4, 6, 7, 11

**OTHER AUTHORITIES**

John A.E. Pottow, *The Nondischargeability of Student Loans in Personal Bankruptcy Proceedings:  The Search for a Theory*, 44 Canadian Bus. Law J. 2006, 245 ...............................2

# I.
## Introduction

TO THE HONORABLE MARILYN LOUISE HUFF, UNITED STATES DISTRICT COURT JUDGE, EDUCATIONAL CREDIT MANAGEMENT CORPORATION ("ECMC"), UNITED STATES OF AMERICA ("USA") AND COUNSEL OF RECORD:

Plaintiff Paul Hupp hereby files his closing brief on appeal.

# II.
## Argument-USA

1) <u>Strict Scrutiny Review of Fundamental Constitutional Right</u>

The right to the "basic necessities of life" (such as food clothing, housing and medical care), are a fundamental right, as outlined under <u>Shapiro v. Thompson</u>, 394 U.S. 618 (1969). It makes no difference that <u>Shapiro</u> is based on interstate travel, the rule of the case is that an infringement of the "basic necessities of life" deserves a "Strict Scrutiny Review". Just as the right to counsel applies to all indigents in all felony cases (and not just larceny) under <u>Gideon v. Wainwright</u>, 372 U.S. 335 (1963), the right to the "basic necessities of life" applies to any case under <u>Shapiro</u>, not just interstate travel cases.

2) <u>Race Is Always A "Suspect Class"</u>

Race is always a "suspect class" and as such will always trigger a "Strict Scrutiny Review". A statute, such as Title 11 U.S.C. § 523(a)(8), can be race neutral on its face and still be discriminatory in its application. That is the case with Title 11 U.S.C. § 523(a)(8) as proven up in the *numerous* studies submitted at trial and cited on appeal. Indeed, USA has not even attempted to dispute the facts the studies have proven up. They have just ignored the valid and reliable studies of the racially discriminatory effects of Title 11 U.S.C. § 523(a)(8) as applied to people of color. To the extent that Mr. Hupp must prove that the statute was discriminatory against him personally, USA is incorrect because this case should have been certified as class action, which was requested and denied. If the class action is certified as on appeal, then Mr. Hupp does indeed have standing as <u>class representative </u>for those who would be adversely affected by the statute.

1

2      3)  11 U.S.C. § 523(a)(8) Is Not Rationally Related To Legitimate Government Interest

3      Title 11 U.S.C. § 523(a)(8) must have, at the very least, a "Rational Basis" in order for it

4  to be valid. USA submits a conclusory and completely invalid statement that;

5      "Congress originally limited the discharge of student loan debt in the Bankruptcy Reform
       Act of 1978. Pub. L. No. 95-598, 92 Stat. 2549 (codified as amended at 11 U.S.C. §§
6      101-1532 (2006)), because of the rising rate of defaults on student loan debts, In re
       Pelkowski, 990 F.2d 737, 742 (3d Cir. (1993)). Congress enacted this and subsequent
7      amendments broadening the scope of the exception "to prevent abuses in and protect the
       solvency of the educational loan programs." In re Merchant, 958 F.2d 738, 742 (6th Cir.
8      1992).

9
       The problem with this statement by USA (other than the fact it was not cited in their
10
   briefing documents in the trial court and is thereby waived) is that it is entirely untrue. University
11
   of Michigan Assistant Professor of Law John A.E. Pottow states the true background of the
12
   default rates of student loan debtors as it related to bankruptcy in his authoritative 2006 law
13
   review article[1];

14      **"The Nondischargeability Of Student Loans In Personal Bankruptcy Proceedings:**
        **The Search For A Theory"**
15
        "What's most important to glean is that these Nondischargeability provisions came up at
16      the last minute over the opposition of key legislators. Both the primary co-sponsor of the
        1978 Bankruptcy Code (Rep. Don Edwards) and the Chairman of the House
17      Subcommittee on Post Secondary Education who oversaw the education amendments of
        1976 (Rep. James O'Hara) objected to the introduction of a student loan
18      nondischargeability rule [footnote]. O'Hara protested bitterly that Congress was "fighting
        a 'scandal' that exists primarily in the imagination" and that the amendment treats
19      educational loans precisely as the law now treats loans incurred by fraud, felony and
        alimony-dodging"…The evidence of a lower than 1% default rate of federally insured
20      student loans in bankruptcy did not block the nondischargeability provision from entering
        the bankruptcy code…" (at 248-249, a true and correct copy of said law review article is
21      attached to, made a part of and by this reference incorporated into this brief as Exhibit
        #1).
22

23

24

25
   _____

   [1] Published in 44 Canadian Bus. Law J., 2006, 245

IF THERE IS NO PROBLEM WITH STUDENT LOAN DEBTORS DISCHARGING STUDENT LOANS IN BANKRUPTCY, THEN THERE CAN BE NO "RATIONAL BASIS" FOR THE BANKRUPTCY LAW CHANGES.

This proves up the fact that federally insured student loans being discharged in bankruptcy did not provide a "Rational Basis" for such an overbearing and draconian change in the statute.

In addition, the 2005 revisions adding <u>private student loans</u> to the nondischargeability provision of Title 11 U.S.C. § 523(a)(8) (documented and discussed at length by Expert Witness Mark Kantrowitz in Plaintiff's Opening Brief) had absolutely NO DISCUSSION from the Congress prior to its insertion in that act (again, as proven up by undisputed Expert Witness evidence).

　4)　<u>Student Loan Contracts Must Have A Statute Of Limitations</u>

USA makes an incorrect statement of fact by stating this issue was not raised in the trial court and is therefore waived.

The issue was properly raised in the trial court on August 20, 2007 in:

**"PLAINTIFF PAUL HUPP'S SUPPLEMENTAL OMNIBUS BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGEMENT OR ALTERNATIVELY SUMMARY ADJUDICATION"**

Served on all parties on August 20, 2007and filed in the U.S. District Court where the case was pending on a "Withdrawal of Reference" motion (U.S.D.C. case No. 07-cv-1232 WQH (NLS)). USA did not file a timely objection to this brief. When the "Withdrawal of Reference" motion was denied all documents filed in the District Court were transferred to the bankruptcy court. This particular document was logged into the bankruptcy docket on October 19, 2007 as docket number 158. It was not until November 5, 2007, more than 2.5 months after the brief was served that USA objected. Even using the later October 19, 2007 date as the timeline for a timely objection, USA still did not respond in a timely manner (14 days = timely, USA responded on day 15). As such the brief was properly submitted and Judge Meyers abused his discretion and exceeded his authority in striking it.

The brief was timely served on all parties, USA did not timely respond. USA had been given numerous extensions of time to refine and supplement their briefs over the repeated objections of Mr. Hupp (including in this court) and as such Mr. Hupp was just as free to refine and supplement his side of the case.

USA makes the mistake of claiming Mr. Hupp is tying his statute of limitation claim to Title 11 U.S.C. § 523(a)(8), not so.

It is Title 20 U.S.C. § 1091a that bars a statute of limitation claim on student loans. The student loan contract itself has been exempted from a statute of limitations under Title 20 U.S.C. § 1091a, not Title 11 U.S.C. § 523(a)(8). Virtually <u>all</u> civil actions and <u>all</u> criminal acts have a statute of limitations-even murder. Failing to timely pursue any action, including murder, when you have the resources to do so violates substantive due process, grounded in the Fifth Amendment to the Constitution.

In this case you have a private actor that can virtually wait as long as they want without taking any action on enforcing their rights to a claim with impunity, to the detriment of the debtor. One cannot seriously entertain the notion that a private actor to a contract could wait 40, 50, and 60 years or longer and still have a legitimate claim to any type of action. Yet Title 20 U.S.C. § 1091a allows just that. It violates due process. Due process is a right grounded in the Constitution and therefore the no statute of limitations provision under Title 20 U.S.C. § 1091a is unconstitutional.

Mr. Hupp encourages USA, or the Court, to prove up even one other civil or criminal action in America that has no statute of limitations.

In addition, Title 20 U.S.C. § 1091a is *ex post facto* law, retroactive legislation, discussed *infra*.

5) <u>The Penalties Allowed Under Title 20 U.S.C. § 1091a Are Unconscionable</u>

USA makes an incorrect statement of fact by stating that this issue was not raised in the trial court and is therefore waived. This issue was raised in the trial court, in the same brief cited under No. 4) *supra*.

Paul Hupp-08-cv-0414 H
Closing Brief on Appeal

Mr. Hupp does not argue the contract is unenforceable because the terms are unconscionable, he simply argues that the unconscionable terms are unconstitutional and should be stricken. In this case the unearned fees, which caused a $7,000 dollar loan to explode to over $75,000, should be stricken.

The notion that the Congress has exempted itself and private actors from the provisions of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 and the California Rosenthal Fair Debt Collection Practices Act, California Civil Code § 1788 so they can recoup "collection costs" is pure nonsense, and proves up the fact that the penalties and fees being added into these student loans are not "collection costs" at all, because if they were legitimate there would be no need to exempt them.

The penalties and fees are nothing more than a scam rip off of the debtor to line the pockets of the companies receiving them, and getting rich. Those companies no doubt then pass on a portion of the scam fees and penalties to the Congress in the form of "campaign contributions" (think Randall "Duke" Cunningham).

6)  <u>Tortious Interference By Any Government Agency Violates Due Process</u>

When a government agency, <u>any</u> government agency, tortiously interferes with the ability of a student loan debtor to repay a student loan, that fact standing alone should be grounds for discharge because that indeed is an "undue hardship". In addition, the (pretext) reason for nondischarge of a student loan in bankruptcy was to prevent bad faith debtors' relief, not to allow honest debtors to be railroaded by the government.

7)  <u>The Term "Undue Hardship" Is Vague, Ambiguous And Overbroad</u>

This claim is ripe for appeal, and was properly raised in the trial court, as stated *supra*. Any statute that is unclear, hard to interpret, understand or know how to apply is subject to being stricken for vagueness, ambiguity and over broadness, not just criminal statutes as USA implies.

Title 11 U.S.C. § 523(a)(8) is so incomprehensible that NO ONE knows what the rule is or how to apply it. As stated in Mr. Hupp's opening brief, the judges don't know what it is or how to apply it, the lawyers don't know what it is or how to apply it and the student loan debtors sure don't know. You could have 100 different student loan cases and get 100 different

Paul Hupp-08-cv-0414 H
Closing Brief on Appeal

interpretations of the law. Indeed, one just needs to look at the instant case, an indigent student loan debtor, made indigent at the hands of the government, with no attorney to argue his case, no housing, no medical care, no transportation, no food and just about as down and out as you can get and still NO DISCHARGE from the court! If that does not define the vague, ambiguous and overbroad standard then nothing does.

Title11 U.S.C. § 523(a)(8) is totally, completely, utterly and substantially incomprehensible, and anyone who says different has a bias.

8)  Collection Fees/Penalties Violate 8th Amendment's Ban On Excessive Fines

The fees added in to student loans, as outline *supra*, are not "collection costs" and the fact that the Congress has allowed these fees and penalties exemption from the various fair debt collection acts proves that up, because if they were legitimate there would be no need to exempt them.

Other major problems (discussed *infra)* not addressed by USA, is that a loan holder can **intentionally** force a default so they can add on these bogus fees and penalties, knowing full well that there is no way out for the student loan holder. No discharge in bankruptcy. No statute of limitations. Add in the garnishing of wages, tax refund interceptions and levying of bank accounts all without a court order or any other judicial means to argue against these scams and you have a situation where the loan holder has MAJOR INCENTIVES to force defaults on student loan debtors. And indeed that is exactly what they have done in this case. Mr. Hupp would not be here today if the loan holder had granted a deferment or forbearance. Instead the loan holder forced a default for the obvious reason of making money, unearned money, off the backs of the poor and indigent because there is simply no other alternative for the student loan holder.

USA states;

"The legislative history of § 1091a demonstrates that it was designed not with a punitive purpose but rather with a remedial one: "to reduce collection costs".

The problem with this assertion is that USA never submitted it in their arguments at trial, so even if this were to be true (and Plaintiff does not concede it is true) they have waived this argument and commentary on the legislative history of Title 20 U.S.C. § 1091a.

Also ignored by USA is the fact that the loan holder refused to process legitimate FALSE CERTIFICATION discharge applications, by falsely stating that they did not apply to Mr. Hupp. This was a flat out lie, but what can a poor indigent student loan holder do when a loan holder engages in this misconduct? Nothing, there is nothing a debtor can do.

9)  Forced Default On Student Loan Debtors

One glaring omission in USA's response brief is their failure to address the **intentional** and **forced** default of Mr. Hupp's student loans.

By knowingly, willfully and intentionally forcing Mr. Hupp into a default by not granting his repeated requests for a deferment or forbearance the loan holder was able to add in these bogus penalties and fees with impunity. The loan holder has a vested, pecuniary and monetary interest in forcing defaults.

Again, there is nothing a poor indigent student loan debtor can do. For these reasons the student loan laws that allow this type of nonsense violate substantive due process under the Fifth Amendment and should be stricken down by the court.

10)   Loan Holders Intentionally Refuse To Process FALSE CERTIFICATION Forms

The loan holders in this case, as stated in Mr. Hupp's opening brief and completely ignored by USA, intentionally refused to process several FALSE CERTIFICATION loan discharge application forms. And why would they process these forms when that would interrupt their income flow and there is nothing the indigent student loan can do about it? The loan holder has a financial incentive to NOT process the discharge applications or follow the law/rules just as they had a financial incentive to not grant deferments or forbearances, forcing defaults. They make big money by NOT following the rules.

Again, this is a direct violation of substantive due process under the Fifth Amendment and should be stricken down by the court.

11)    <u>Title 20 U.S.C. § 1091a Is Retroactive Legislation</u>

USA incorrectly misapplies the retroactive legislation argument of Title 20 U.S.C. § 1091a to Title11 U.S.C. § 523(a)(8).

Title 20 U.S.C. § 1091a was put into place AFTER Mr. Hupp took out his student loans. This retroactive legislation allowed the government and it's actors (student loan holders) to change material terms of the student loan contract. That is unconstitutional and should be stricken down by the court.

In the United States *ex post facto* laws are prohibited in federal law by Article 1, Section 9 of the Constitution, and in state law by Section 10.

This retroactive legislation also violates the Contracts Clause. Although USA is correct in stating that the Contacts Clause does not apply directly to the United States, it certainly applies to student loan holders such as Sallie Mae/USAFunds who are private actors.

The Supreme Court laid out the test for whether a law violates the Contract Clause in <u>Energy Reserves Group v. Kansas Power & Light</u>, 459 U.S. 400 (1983). The test is a three part test. First, the state regulation must substantially impair a contractual relationship. Second, the govenrment "must have a significant and legitimate purpose behind the regulation, such as the remedying of a broad and general social or economic problem." 459 U.S. at 411-13. Third, <u>the law must be reasonable and appropriate for its intended purpose.</u> Title 20 U.S.C. § 1091a violates all thee prongs of the test, 1) it substantially impairs Mr. Hupp's student loan debt, 2) the government has no legitimate purpose in passing such a one sided law, and last 3) the law is not reasonable or appropriate in its application.

In <u>United States Trust Co. of N.Y. v. New Jersey</u>, 431 U.S. 1 (1977) the Supreme Court held that a <u>higher level of scrutiny</u> was needed for situations where laws modified the government's own contractual obligations. Since the government is a direct party to student loan contracts it must meet a higher level of scrutiny to succeed on any changes made in their contracts.

Title 20 U.S.C. § 1091a is nothing more than retroactive legislation granting the government and its actors the right to change a prior contract so it is favors the government and

Paul Hupp-08-cv-0414 H
Closing Brief on Appeal

their actors at the expense of the opposing party. Title 20 U.S.C. § 1091a takes away statute of limitations on student loans to the detriment of the borrower and allows outrageous fees and penalties to be added on to the detriment of the borrower.

Mr. Hupp, and all other student loan borrowers, from the time they enter into a student loan contract, have the right to be free from retroactive changes in that binding contract.

12)    Multiple Extensions Of Time And *Ex Parte* Communications Violate Due Process

USA has been granted multiple extensions of time, while refining, tightening up and polishing their briefs. Judge Peter Wentworth Bowie knowingly, willfully and intentionally refused to implement Federal Rules of Civil Procedure Rule 16 (F.R.B.P Rule 7016) and that repeated, persistent and abusive behavior almost caused Mr. Hupp to default the case.

Rule 16 is there for a reason, like all of the rules, and when a judge thumbs his nose at the rules and harming litigants before him, then there has been a due process violation. And make no doubt about it; the constant delay by Judge Bowie harmed Mr. Hupp. This conduct has never been a two way street, as evidenced in this very court. When Mr. Hupp asked for an extension of time not once but twice, he was refused. Yet when USA asks it is rubber stamped no questions asked. It has been a one-way street like that from day one, with the advantages always going to whoever was m. Hupp's opposing party.

As to *the ex parte* communications engaged in by Judge Meyers Courtroom Deputy Marcia Pearson, USA claims that the communication was permissible. The duties to arrange the schedule of the parties around motions are for the lawyers and the parties, not the Courtroom Deputy. When the court does get involved with scheduling matters it must be with the advice and consent of ALL parties. Marcia Pearson made no attempt to comply with this simple, straightforward rule. Nothing of substance is done *ex parte*. Delaying a motion for summary judgment for an entire month after the motion had already been delayed over a year due to judicial misconduct was just another example of one sided, biased actions taken by the courts to the benefit USA and the detriment of Plaintiff.

**III.**
**Argument-ECMC**

1)    Plaintiff Complied With All Local Rules Including Discovery "Meet & Confer"

Paul Hupp-08-cv-0414 H
Closing Brief on Appeal

1  ECMC falsely states that Mr. Hupp's motions to compel were not granted because he

2  failed to comply with local rules requiring a "meet and confer" prior to the motion (ECMC

3  Response Brief ("ECMC-RB") P:5, L:2-5). This is in fact false. All local rules were followed

4  and indeed that court erred in that finding (06-90127 Docket ("DK") # 65, 69). The bankruptcy

5  clerk had left off several pages when scanning in Mr. Hupp's motion to compel, including the

6  one detailing the "meet and confer" requirement, the court was advised of this error and entered

   a new order dated April 9, 2007 noting that ALL local rules were indeed followed (and yet again

7  denying virtually 100% of the propounded discovery requests). ECMC is well aware of that fact

8  because they were present when that order was handed out (DK# 107), this also indicates that

9  ECMC is not putting forth an honest, good faith effort in dealing with this court on appeal. A

10 lack of candor in presenting "facts" should cause serious concern for any judge.

11  Also Mr. Hupp filed three (3) motions to compel, one (1) to USAF and two (2) to ECMC,

12 and all three (3) were denied in FULL-100%. Not a single interrogatory, request for admission or

13 request for production of documents was granted. Not even an accounting of the loan, it's

   balance or a break down of principle, interest, penalties or fees. Mr. Hupp's entire discovery plan

14 was wiped out-everything.

15  2)    Constitutional Arguments Can Be Raised At Anytime In The Trial Court

16  ECMC claimed several times at the trial court level that Mr. Hupp could not raise his

17 constitutional claims because they were not in his original complaint. Constitutional issues can

18 be raised at anytime in the trial court, and indeed Mr. Hupp raised them well in advance of the

19 summary judgment motion and trial (DK #44). ECMC also claims USA raised these same

20 objections (ECMC-RB, P:6, Footnote7), but in fact this is not true. USA never raised any

21 objection at anytime to the constitutional challenges being untimely, nor do they now on appeal.

22  3)    ECMC Claims Plaintiff Engaged In "Name Calling & Outlandish Accusations"

   ECMC states that Mr. Hupp has not met his evidentiary burden and instead "resorts to

23 name calling and outlandish accusations". (ECMC-RB, P:9, L:13-14).

24

25

Mr. Hupp has never called any party names or made any "outlandish accusations", whatever that term encompasses. Nor has ECMC cited to any of this so-called behavior. This appears to be nothing more than a smear tactic to counter for their weak position in the case.

    4)   Procedural Due Process Must Be Followed

ECMC claims that failure of the trial court to follow fair procedural due process is NOT required under the law. (ECMC-RB, P:10, L:8-17). But if this were the case there would simply be no need for any rules of procedure at all. Every court could just "wing it" to their hearts content. Judge Bowie, as previously stated, blocked Mr. Hupp's entire discovery, essentially torpedoing his entire case. That would hardly qualify as "simple error".

    5)   Mr. Hupp Had No Meaningful Chance To Be Heard Via Due Process Violations

ECMC claims Mr. Hupp had a chance to "be heard" and the procedural due process violations engaged in by Judge Bowie either did not happen or are irrelevant. Indeed ECMC states that Mr. Hupp was afforded a hearing with all the protections of the "procedural safeguards inherent in the Federal Rules of Civil Procedure and the Federal Rules of Bankruptcy Procedure". (ECMC-RB, P:11, L:2-21).

Mr. Hupp was not given a meaningful chance to be heard because Judge Bowie blocked his entire discovery, drowning out any chance he had to be heard and the record easily proves this up. Judge Bowie's complete and utter disregard for Rule 16 establishing time fames for fair and effective case management has been discussed numerous times in this appeal and will not be addressed again here, but it buttresses the fact that Judge Bowie was doing everything he could to torpedo Plaintiff's case.

    6)   Judge Bowie Allowing USAF To Transfer Out Of Case Violated Due Process

ECMC claims Mr. Hupp objected to them transferring into the case. (ECMC-RB, P:12, L:19). Not true, Mr. Hupp objected to USAF TRANSFERRING OUT of the case, because they were an indispensable party whom Mr. Hupp had made allegations of misconduct in his complaint. Such misconduct, if proven up, would have been grounds for dismissing the student loan all together. (DK #1). Without USAF as a party Mr. Hupp could not get the discovery needed to prove up his claims of loan holder misconduct, a central element of his complaint.

ECMC then states that USAF denied his FALSE CERTIFICATION DISCHARGE APPLICATIONS. (ECMC-RB, P:12, Footnote 11). 100% false, USAF never even processed his FALSE CERTIFICATION DISCHARGE APPLICATIONS, so they were never denied. This very issue was why USAF was an indispensable party to the action. The bankruptcy court was the proper forum to address these issues, because the FALSE CERTIFICATION DISCHARGE APPLICATIONS had a bearing on the validity of the underlying student loan that the bankruptcy action was grounded upon.

7)    Denial Of Class Action Certification Was Improper

ECMC states that Mr. Hupp was not entitled to class action status because the "bankruptcy court had ample legal rationale for denying it". (ECMC-R, P:15, L:12-14). Since ECMC does not state what this "rationale" was that the court used, it is open to speculation. Mr. Hupp submitted seven (7) sworn declarations from other student loan debtors that outlined the reasons why class action should have been granted, Judge Meyers made no ruling, on the record or otherwise, on why the class action was denied.

8)    ECMC Claims Mr. Hupp Offered No Evidence To Meet The "Undue Hardship" Test

ECMC stated Mr. Hupp "...offered no evidence that would substantiate his claim that it would be an undue hardship to repay his student loan". (ECMC-RB, P:16, L:26-27).

If having a state licensing agency tortiously interfere with your livelihood, if needing tens of thousands of dollars in medical care and dental care, if having no usable or transferable job skills, if having no food, housing, transportation or clothing, if having a loan holder intentionally force you into a student loan default driving up penalties and fees 1,200%, if having a loan holder refuse to process FALSE CERTIFICATION DISCHARGE APPLICATIONS, if all of these issues do not amount to "evidence that would substantiate" Mr. Hupp's claim then ECMC is correct. But in every other court in America that would be ample "evidence" to meet the "undue hardship" test.

9)    Second Prong Of Brunner Undue "Hardship Test" Was Met

ECMC lists several reasons why Mr. Hupp does not meet the second prong of the "undue hardship" test. (ECMC-RB, P:17, L:2-17). The problem with ECMC's analysis is the same

problem Judge Meyers made, they do not analyze Mr. Hupp's circumstances to those outlined in Nys. In re Nys, U.S. App. Lexis 10409, 446 F.3d 938 (9th Cir. 2006).

In Plaintiff's Opening Brief on Appeal he laid out the factors to be analyzed in Nys, and how Judge Meyers did not analyze a single factor. Here ECMC has done the exact same thing. They blow a lot of smoke in the air, but in the end they have failed to analyze Mr. Hupp's factors against the non-exhaustive list of factors outlined in Nys.

Mr. Hupp spent 13 years of his life, 1987-2000, fighting false charges by the Commission on Teacher Credentialing ("Commission"). If he did not fight those charges he would never have been cleared to work as a teacher in California, he would never have been considered for teaching in any other state and he would have had trouble getting a professional license in any other field because of that teaching license denial. Mr. Hupp's family spent $15,000 +/- dollars defending the first round of that litigation. Mr. Hupp litigated *Pro Se* the second round in the Superior Court- because he had no money and had no job.

Standing up for legal rights and vindicating one's self through the legal system can never be considered as a reason to not discharge a student loan, especially when the government has acted in bad faith.

10)    One Cannot Litigate A Student Loan Case *Pro Se* And Work At The Same Time

ECMC makes a pretty wild and outlandish claim by stating "many litigants are able to work ...while litigating student loan cases". (ECMC-B, P:17, L:24-25). That has to be the whopper of the century in student loan litigation. It is a flat out lie. Nothing more.

First, as stated previously, Mr. Hupp's student loan adversary proceeding was the ONLY claim filed during the 2006 calendar year in the entire Southern District.

Second, M. Hupp challenges ECMC to name one - just one other student loan case during the last 10 years in the Southern District that was litigated by a Pro Se litigant who was also working. Not out there.

It is never a good idea to fabricate falsehoods (such as **many** Pro Se litigants can work and litigate a student loan case at the same time) against a person who knows the facts about those issues inside out.

The legal briefs that have been filed in this case did not write themselves, it was not magic word processing. Plaintiff drafted every single document in this case, and Plaintiff himself performed all the work that went into drafting the briefs. For the Opening Brief in this case, Plaintiff had to draft the entire brief in 21 days, working everyday for 10 hours or more per day to meet the time deadline. I am sure there are **many** Pro Se litigants working fulltime and engaging in this type of litigation according to ECMC's logic.

11)    Plaintiff Not Only Sought Gainful Employment, He Was Gainfully Employed

One of the more egregious abuses from Judge Meyers was when he stated Mr. Hupp had not sought gainful employment. (ECMC-RB, P: 17, L:16-17). Mr. Hupp not only sought gainful employment, he was gainfully employed. In fact he was gainfully employed numerous times BEFORE the Commission tortiously interfered with his employment.

Of course the bigger problem about Mr. Hupp losing his job was that he had no money to pay his debts and his loan holder intentionally forced him into a default, thereby driving his loan into the stratosphere. Making a false statement like that, in light of the entire record and facts, proves up just how ambiguous and overbroad Title 11 U.S.C. § 523(a)(8) really is.

12)    ECMC Misstates Plaintiff's Professional Background

ECMC states Mr. Hupp has a "teaching credential". Not true. ECMC states Mr. Hupp has "eligibility for a regular teaching credential". So does a first semester teaching major. Mr. Hupp also has *eligibility* to be President of the United States. ECMC states Mr. Hupp has a "real estate associate license". Not true, Mr. Hupp has a "Real Estate Salesperson" license, as do half a million other licensed salespersons in California. (ECMC-RRB, P:17, L: 24-28).

ECMC then goes on to *speculate* about what "the Bankruptcy Court took into consideration when it found that Hupp could certainly take steps to earn more income". (ECMC-RB, P:18, L:3-10). Speculation is NOT evidence, and this entire line of argument in ECMC's response should be stricken.

ECMC goes on to make nonsensical *speculative* statements about Plaintiff's "hyper-focus on his teaching credentials was a result of a deep desire to work as a teacher...". (ECMC-RB, P:18, L:11-13). This is a very bizarre statement, and one must wonder what this was put into the

brief for. Mr. Hupp spent five (5) plus years, tens of thousands of study hours and loss of income while attending school during those five (5) years of study so HE COULD BECOME A TEACHER! That is not a secret, it is not a rocket science revelation. That was what he went to college for. That is what he was hired for right out of college for. This has also been stipulated to and admitted by Plaintiff since day one.

13)    Plaintiff's Legal Background Was Fully Vetted At Trial

ECMC states that there was no evidence presented concerning Mr. Hupp's legal background;

> "...there is no evidence whether Hupp had passed the bar, there, likewise, was no evidence as to why Hupp could not pass the bar or whether he had already attempted it in California or in Michigan (where he attended law school)". (ECMC-RB, P:18, Footnote 15).

This issue was vetted in great detail at trial. Indeed this supposed lack of "evidence" on these matters were all fully disclosed at trail. Either ECMC "forgot" about these issues, or they are straight up lying, one of the two.

Mr. Hupp has not passed the California bar, and even if he had passed the California bar, the State Bar of California has denied him a moral character clearance, which prevents him from becoming an attorney. There is no chance of Mr. Hupp becoming a lawyer in California or anywhere else, now or in the immediate future. In addition, Mr. Hupp's student loans have no relationship to his legal education.

14)    Mr. Hupp Would/Will Do Any Job That Pays A Living Wage

ECMC states that Mr. Hupp should do any job that pays more, and Mr. Hupp agrees. If there was a job offered to him in ANY field that pays a living wage for the area, as long as it was a legal job, Mr. Hupp would do it. The problem is finding one of those jobs. According to Lou Dobbs, 36% of all men over the age of 25 in America today earn less than $25,000 per year (Lou Dobbs, December 22, 2007, CNN).

Mr. Hupp has taken all kinds of jobs in the private sector, as outlined in his Complaint (DK #1), such as Trader Joe's, Safeway, Ralph's, Sperry Van Ness, Marcus and Millichap, Rancon Real Estate and Sysco Foodservices. They all paid minimum or near minimum wage.

Sysco, Sperry Van Ness, Marcus and Millichap and Rancon all paid less than minimum wage. Finding a job that enables you to live your life and also pay back a modest student loan in a service sector economy, especially in San Diego, is impossible. (DK #1).

There are jobs out there, the problem is they are low paying, no benefit, service sector jobs. It is hard to imagine that a motivated applicant would not take a good paying job and pay their debts, and Mr. Hupp certainly has in the past and will in the future if one is offered.

Mr. Hupp is ready, willing and able to take any job he is capable of doing that pays a living wage. No rocket science here.

15)    *Goulet* is Distinguished From Plaintiff's Case

ECMC cites Goulet v. Educ. Credit Mgmt. Corp., 284, F.3d 773 (7th Cir. 2002) to try to prove up their weak case. (ECMC-RB, P:19, L1-13). The difference between Goulet and this case is that Goulet did not try to use his degree, and his loan was directly attributable to the amount he borrowed. Mr. Hupp not only sought employment in his major, he was hired within three (3) months of graduating college. Mr. Hupp's loan amount is not the result of what he borrowed, but the result of a broken system that encourages loan holders to force defaults on debtors. Indeed, 90%+ of Mr. Hupp's loan balance is a direct result scam fees and penalties.

16)    USAF Intentionally Forced Mr. Hupp Into Default

ECMC claims that USAF's forced and intentional default of Mr. Hupp's loan is "absurd". (ECMC-RB, P:19, L:18). The circumstances of the intentional and forced default have been stated clearly and will not be repeated here. In addition, ECMC has no evidence of USAF and Mr. Hupp's interactions or communications whatsoever, so the notion that they would be in a position to determine what is true and what is not true, what USAF did or did not do, is "absurd".

17)    ECMC Claims Mr. Hupp Has A Claim Against The Commission

Mr. Hupp wanted to sue the Commission, and had several cause of actions. He could not find an attorney to take the case on a contingency. In most cases an attorney will only take a contingency fee on personal injury cases in which  there is a better than average chance of winning. In any event, Plaintiff was indigent and did not have a dime to his name in 2000 when he won his cases against the Commission. Plaintiff contacted scores of lawyers, not one would

take the case. Now, if there were no "statute of limitations" on bringing actions against the Commission Mr. Hupp would be in business, but apparently only Big Business and the federal government get those kinds deals.

  18) <u>Mr. Is Not Eligible To Work As A Substitute Teacher</u>

ECMC states;

> As the Bankruptcy Court indicated, **if** Hupp's expenses [footnote] remained exactly the same, consistently working as a substitute teacher would enable him to repay his student loans rapidly. (ECMC-B, P: 20, L: 1-3).

  The problem is that this is not what the court said in its opinion. The court said if Mr. Hupp worked 50 weeks per year, five (5) days a week, fulltime, at a wage of $105 per day (which is *not* the pay scale) and applied 100% of that money to his student loan, the loan could be "repaid in five years". This is "pie in the sky" nonsense and was thoroughly rebuked in Plaintiff's Opening Brief.

  In addition, as pointed out in Mr. Hupp's Opening Brief, this statement by the court has no foundation or factual basis. Mr. Hupp is not eligible to work in any school within California, as a substitute or otherwise, because there is no need for teachers with a 30-Day Emergency Substitute Teaching Permit. And even if there were jobs available as a substitute you would never work more than six (6) or seven (7) months out of the entire year, even being available fulltime, year round.

  19) <u>Plaintiff Made Good Faith Effort To Repay Loan</u>

  Mr. Hupp made a heroic effort to repay his loan. He did everything he was supposed to do, including securing gainful employment within 90 days of graduating from college. ***But for*** the Commissions repeated interferences and meddling in his profession over a 14-year time span, engaging in *per se* defamation, the loans would have been paid back. That is clear from Mr. Hupp's requests for deferments and forbearances on his loans for the first 10 years of the loan. If USAF had granted a deferment or forbearance we would not be here today. But they didn't, why should they when they can turn a $7,000 dollar loan into a million dollar plus loan by forcing a default.

20)    <u>Judge Bowie And Judge Meyers Both Engaged In Misconduct</u>

ECMC seems to think that because Mr. Hupp called Judge Bowie and Judge Meyers onto the carpet for their misconduct and manipulations in the case, that this somehow entitles ECMC to automatically prevail on appeal. (ECMC-RB, P:21, L:13-28).

The fact of the matter is the 9th Circuit kicked Judge Bowie off the case for misconduct, and he should be kicked off the bench. Judge Meyers made no substantive analysis on the constitutional issues at all, he did not even attempt to. On the case law Judge Meyers did absolutely no analysis on the relevant cases as applied to Plaintiff, especially the *Nys* case. Mr. Hupp makes no apologies for the way these judges conducted themselves in this case-none whatsoever.

If ECMC does not like that they can take the issue up with the bankruptcy court. Everything Plaintiff stated in his Opening Brief was accurate and reflected the case.

**IV.**
**<u>Conclusion</u>**

The constitutional challenges are very simple to make a determination on because all you need is common sense. Is it fair to have no statute of limitations on student loans when no other civil or criminal action allows that? Is it fair to allow Big Business, who are also big campaign contributors to the Congress, to impose through the Congress *ex post facto* laws while violating standard consumer protection laws against the poor and indigent? Is it fair to allow Big Business to take a $7,000 loan and turn it into a million dollar plus loan with the help of state government agencies like the California Commission on Teacher Credentialing and loan holders like USAFunds?

The answer is simple; just ask yourself if this happened to you or your family would you allow it? In the end that is all you need to do to find the answer.

///

///

///

1

DATED: June 27, 2008

2

/s/ Paul Hupp
3          Paul Hupp
           965 Hidden Oaks Drive
4          Beaumont, CA. 92223
           Paulhupp@sdsualumni.org
5          (951) 769-1268
           *Plaintiff-Appellant*
6          *In Propria Persona*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Paul Hupp-08-cv-0414 H
                                                    Closing Brief on Appeal

# Exhibit #1

# UNIVERSITY OF MICHIGAN

JOHN M. OLIN CENTER FOR LAW & ECONOMICS

## THE NONDISCHARGEABILITY OF STUDENT LOANS
## IN PERSONAL BANKRUPTCY PROCEEDINGS:
## THE SEARCH FOR A THEORY
*Published in 44 Canadian Bus. Law J., 2006, 245*

JOHN A.E. POTTOW

PAPER #07-005



SSRN ABSTRACT AVAILABLE AT HTTP://SSRN.COM/ABSTRACT=967379

THIS PAPER CAN BE DOWNLOADED WITHOUT CHARGE AT:

MICHIGAN JOHN M. OLIN WEBSITE
HTTP://WWW.LAW.UMICH.EDU/CENTERSANDPROGRAMS/OLIN/PAPERS.HTM

# THE NONDISCHARGEABILITY OF STUDENT LOANS IN PERSONAL BANKRUPTCY PROCEEDINGS: THE SEARCH FOR A THEORY

*John A. E. Pottow**

## ABSTRACT

Student loans are not dischargeable in personal bankruptcy proceedings in the United States. Why is that so? The answer to that question has remained largely unexamined in bankruptcy scholarship to date. Doctrinal and empirical pieces have sprouted up here and there (some quite good), but theoretical treatment has been sparse. This article seeks to help fill that void. It assembles various defensible theories (some more defensible than others) under which student loans should be treated as nondischargeable debts. It then takes a comparative perspective by looking at how the laws in various jurisdictions square with these theories. The United States rates poorly; its laws tend toward implementation of the least defensible theories and only tangentially embrace the more compelling ones. By contrast, countries such as Australia and New Zealand, which take an income-contingent approach to student debt default, are on the right track.

---

* Assistant Professor of Law, University of Michigan Law School. Thanks to Stephanie Ben-Ishai, Rich Friedman, Sir Roy Goode, Reshma Jagsi, Elizabeth Warren, Jim White and Jacob Ziegel for comments and Rita Abro, Trevor Broad, Mike Murphy and Elizabeth Nestor Haas for research. This paper was developed from a presentation to the 35th Annual Commercial and Consumer Law Workshop, held at the University of Toronto Faculty of Law, October 2005; participants there were most helpful too.

# THE NONDISCHARGEABILITY OF STUDENT LOANS IN PERSONAL BANKRUPTCY PROCEEDINGS: THE SEARCH FOR A THEORY

*John A.E. Pottow\**

## I. INTRODUCTION

In fiscal year 2002, approximately 5.8 million Americans borrowed $38 billion (USD) in federal student loans. This was more than triple the $11.7 billion borrowed in 1990.[1] As a rule of thumb, tuition has been increasing at roughly double the rate of inflation in recent years.[2] This troubling trend of accelerating tuition, coupled with the fact that real income has stagnated for men and increased only modestly for women over the past two decades,[3] means that more and more students are going to need to turn to borrowed money to finance their degrees absent a radical restructuring of the post-secondary education system.

---

\*    Assistant Professor of Law, University of Michigan Law School. Thanks to Stephanie Ben-Ishai, Rich Friedman, Sir Roy Goode, Reshma Jagsi, Elizabeth Warren, Jim White and Jacob Ziegel for comments and Rita Abro, Trevor Broad, Mike Murphy and Elizabeth Nestor Haas for research. This paper was developed from a presentation to the 35th Annual Commercial and Consumer Law Workshop, held at the University of Toronto Faculty of Law, October 2005; participants there were most helpful too.

1.    See United States General Accounting Office, *Report to the Secretary of Education, Federal Student Aid: Timely Performance Plans and Reports Would Help Guide and Assess Achievement of Default Management Goals* (GAO-03-348, February 2003), online at <http://www.gao.gov/htext/d03348.html>.

2.    See *Trends in College Pricing* (CollegeBoard, 2005), online at <http://www.college-board.com/prod_downloads/press/cost05/trends_college_pricing_05.pdf> (adding that while there were relatively large tuition increases at public four-year institutions in the early 1980s and again in the early 1990s, the rate of increase has grown even higher in the early 2000s).

3.    See U.S. Census Bureau, *Current Population Survey, Annual Social and Economic Table P 36, Full-Time, Year-Round All Workers by Median Income and Sex: 1955-2004*, online at <http://www.census.gov/hhes/www/income/histinc/p36ar.html>. For a critique of the regressive effects wage stagnation has wrought on the entry of both spouses into the workforce, see Elizabeth Warren and Amelia Warren Tyagi, *The Two Income Trap: Why Middle-Class Mothers and Fathers Are Going Broke* (New York, Basic Books, 2003), especially at pp. 49-53.

Policymakers have paid increasing attention to the problems and issues surrounding these student loans. Just recently, the U.S. Congress decided to cut funding to government-funded student loan programmes to help balance the federal budget deficit.[4] But what has been largely unexamined in legal literature is the treatment of student loan debt in personal bankruptcy proceedings.[5] This is so even as a 2005 overhaul to the consumer bankruptcy laws in the United States added yet another amendment to the student loan dischargeability provisions.[6]

Currently, the U.S. Bankruptcy Code gives student debt the extraordinary treatment of nondischargeability.[7] This means that unlike all other unsecured debts, student loans do not get discharged in a debtor's bankruptcy proceeding. They survive a filing and continue to haunt the debtor in his post-bankruptcy life ("staling" his otherwise "fresh" start). This is harsh and dramatic treatment, and it is worthy of scholarly attention. This article assembles the various theories under which student loans could be treated as nondischargeable in bankruptcy and then subjects them to scrutiny. It proceeds as follows. Part II recaps the current U.S. law on student loan treatment in bankruptcy and its convoluted legislative history. Part III presents six possible theories for treating student loans as nondischargeable debts in bankruptcy (Fraud, Soft Fraud, Internalization, Shaming, Public Fisc, and Cost of Private Capital). Part IV offers a critique of how current law comports with each of these theories, and how these theories in turn sit with available empirical data. It concludes by recommending an income-contingent approach similar to the debt relief programmes used by several high-tuition law schools in the United States.[8]

---

4. See Anne Marie Chaker, "Congress Cuts Funding for Student Loans", *Wall Street Journal*, December 22, 2005, at p. D1 (chronicling five-year reduction of $12.7 billion to federal student loans and raising of federal interest rates on student loans).

5. This is not to say that nothing has been written. Much has, but the focus has been doctrinal. See, *e.g.*, Robert F. Salvin, "Student Loans, Bankruptcy, and the Fresh Start Policy: Must Debtors Be Impoverished to Discharge Educational Loans?" (1996), 71 Tul. L. Rev. 139. One thoughtful compilation is Richard Fossey and Mark Bateman, eds., *Condemning Students to Debt: College Loans and Public Policy* (New York, Teachers College Press, 1998).

6. See Bankruptcy Abuse and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23 (2005) (codified as amended in sections of 11 U.S.C.).

7. See 11 U.S.C. § 523(a)(8) (2005).

8. My own law institution, the University of Michigan, has such a programme. It relieves loan payback for students earning less than $36,000 annually. For more information, see the explanation online at <http://www.law.umich.edu/currenstudents/financialaid/debt-management.htm>.

Part of the inspiration for this article is the comparative study on post-secondary education financing being undertaken by Canadian researchers Stephanie Ben-Ishai, Iain Ramsey, and Saul Schwartz ("Ben-Ishai").[9] Their project is an analysis of public student loan assistance programmes, including their forgiveness regimes, and the treatment of student loans in bankruptcy in five countries: Canada, the United States, the United Kingdom, Australia and New Zealand. Indeed, the recommendation that the most compelling treatment of student loans would involve an income-contingent approach builds on the regime used in New Zealand (and other countries).

## II. THE U.S. LAW AND HISTORY

The U.S. federal government has a comprehensive system of directly funded and federally guaranteed (both "subsidized" and "unsubsidized") student loans, complete with programmes for forbearance, deferral and other forms of within-programme relief.[10] Of more familiarity to those focused on bankruptcy law is the U.S. Bankruptcy Code's nondischargeability provision (or what might be termed "conditional dischargeability" provision) of 11 U.S.C. § 523(a)(8). In their most recent listing, freshly revised in October 2005, nondischargeable debts now include:

> (8) unless excepting such debt from discharge under this paragraph would impose an undue hardship on the debtor and the debtor's dependents, for —
>
>> (A) (i) an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution; or
>>
>> (ii) any obligation to repay funds received as an educational benefit, scholarship, or stipend, or
>>
>> (B) any other educational loan that is a qualified education expense, as defined in section 221(d)(1) of the Internal Revenue Code of 1986, incurred by a debtor who is an individual.[11]

---

9.  Stephanie Ben-Ishai, "Government Student Loans, Government Debts and Bankruptcy: A Comparative Study" (2006), 44 C.B.L.J. 211. Ben-Ishai offers some bankruptcy theory in the background discussion of the most recent publication of her project's findings, but the study's focus is chiefly comparative. See *ibid.* My analysis, unfettered by a grant mandate, has the luxury of being able to explore theoretical considerations in more depth.

10. See the Ben-Ishai Appendix, unpublished in this issue but on file with the author, for a helpful summary.

11. 11 U.S.C. § 523(a)(8) (2005). The major change of the 2005 amendments was to encompass *all* student loans (see 11 U.S.C. § 523(a)(8)(B) (2005)), not just student

The history of how student loans became non-dischargeable debt under the U.S. Bankruptcy Code is complex and ongoing. After the Guaranteed Student Loan Program was established under the Higher Education Act of 1965, perceived over-use of bankruptcy to discharge government loans led to § 439A of the Education Amendments of 1976. Section 439A prohibited student loan discharge in bankruptcy until five years had passed after the start of the repayment period of the loan, except in cases constituting "undue hardship".[12] In the comprehensive overhaul of the U.S. Bankruptcy Code enacted in 1978, that treatment of student loans then became addressed under the bankruptcy laws, specifically § 523(a)(8).[13] The full legislative history to § 523(a)(8) (and 439A) is chronicled in Pardo and Lacey's analysis of 261 student loan discharge motions in reported bankruptcy cases, and so the reader seeking more historical detail is referred there.[14] What is probably most important to glean is that these nondischargeability provisions came up at the last minute over the opposition of key legislators. Both the primary co-sponsor of the 1978 Bankruptcy Code (Rep. Don Edwards) and the Chairman of the House Subcommittee on Postsecondary Education who oversaw the Education Amendments of 1976 (Rep. James O'Hara) objected to the introduction of a student loan nondischargeability rule.[15] O'Hara protested bitterly that Congress was "fighting a 'scandal' which exists primarily in the imagination" and that the amendment "treats educational loans precisely as the law now treats loans incurred by fraud, felony, and alimony-dodging".[16] As a partial victory for Edwards, the nondischargeability

---

loans made, insured or guaranteed by the government. Note that the curious diction "debtor and the debtor's dependents" could raise an argument (although it has never been seriously embraced by the courts) that relief is available only to a debtor who has dependents.

12.  See Education Amendments of 1976, Pub. L. No. 94-482, 90 Stat. 2081, 2141 (codified at 20 U.S.C. § 1087-3 (1976 (repealed 1978)) (hereafter "Education Amendments of 1976").

13.  *See* Bankruptcy Reform Act of 1978, Pub. L. No. 95-598, § 316, 92 Stat. 2549, 2678 (effective October 1, 1979).

14.  Rafael I. Pardo and Michelle R. Lacey, "Undue Hardship in the Bankruptcy Courts: An Empirical Assessment of the Discharge of Educational Debt" (2005), 74 Cin. L. Rev. 405 (analyzing 286 generated discharge *determinations*).

15.  See *ibid.*, at pp. 419-28 for a more detailed historical discussion of the "long and tortured" legislative history of 11 U.S.C. § 523(a)(8). *Ibid.*, at p. 421 (quoting *Mallinckrodt v. Chem. Bank (In re Mallinckrodt)*, 260 B.R. 892, 897 (Bankr. S.D. Fla. 2001), revd 270 B.R. 560 (S.D. Fla. 2002)).

16.  See H.R. Rep. No. 94-1232 (1976), reprinted in H.R. Rep. No. 95-595, at pp. 147-48 (1977) and in U.S.C.C.A.N. 5963, 6108-09. In fairness, part of the blame for dataless

enactment was delayed to accommodate his request for a General Accounting Office study on the discharge rate of student loans.[17] Unfortunately, those empirical data, like many empirical data gathered in Washington, fell on deaf ears. The evidence of a lower than 1% discharge rate of federally insured student loans in bankruptcy did not block the nondischargeability provision from entering the Bankruptcy Code — this even so under a comparatively liberal Congress that passed the debtor-friendly 1978 overhaul of the Bankruptcy Code.[18]

Edwards actually lost both the battle and the war. Since 1978, Congress has continued to clamp down on the purportedly lenient treatment of student debt in consumer bankruptcies, passing — often with comfortable bipartisan majorities — revisions to § 523(a)(8) in 1990, 1998 and now 2005. Specifically, in 1990, the five-year bar was extended to a seven-year bar (reminiscent of the durational tinkering the Canadians are now agonizing over with Bill C-55, just as they did with its failed predecessor, Bill C-236 (a private member's bill), on the waiting period for student loan discharge).[19] In 1998, the seven-year bar was extended to an

---

legislative reform falls on the otherwise commendable Bankruptcy Act Commission of 1970, who worried about the possibility of "potential abuses" notwithstanding the documented absence of actual abuses. See H.R. Doc. No. 93-137, at p. 176 (1973).

17. The 1976 Education Amendments had a deferred enactment date of September 30, 1977. See Education Amendments of 1976, *supra*, footnote 13, at § 127(b).

18. The General Accounting Office Report actually persuaded the majority of the House Judiciary Committee to repeal the proposed nondischargeability of student loans from the Higher Education Amendments in consolidating the new Bankruptcy Code, and they submitted a report presenting the General Accounting Office data. See H.R. Rep. No. 95-595, at pp. 139-47; reprinted in 1978 U.S.C.C.A.N. 5963, 6100-08. The report, however, got a "dissent" from Rep. Allen E. Ertel who made it something of a mission to keep the nascent nondischargeabilty provision in the new Bankruptcy Code. See *ibid.*, at p. 536, U.S.C.C.A.N. at p. 6424, for Rep. Ertel's excoriation of "a law that is almost specifically designed to encourage fraud" during "a time when political, business, and social morality are major issues". Ertel carried the day, and the nondischargeability amendment survived when the new Bankruptcy Code was enacted.

19. See Crime Control Act of 1990, Pub. L. No. 101-647, 3261(1), 104 Stat. 4789, 4964-65 (repealed 1998); Student Loan Default Prevention Initiative Act of 1990, Pub. L. No. 101-508, 104 Stat. 1388, 1388-28 to 1388-29. The Canadian proposals seek to amend a ten-year period down to a seven-year period (following an earlier proposal, in a private member's bill, to bring it down to a two-year period). See An Act to Amend the Bankruptcy and Insolvency Act, Bill C-236 (Private Member's Bill), 38th Parliament, 1st Session 2004-2005 (first reading October 20, 2004); An Act to Establish the Wage Earner Protection Program Act, to Amend the Bankruptcy and Insolvency Act and the Companies' Creditors Arrangement Act, Bill C-55, 1st Sess., 38th Parl., received Royal Assent November 25, 2005.

infinite-year bar (that is, student loans are never dischargeable, after any interval of time, unless undue hardship can be shown).[20] These successive legislative restrictions made clear "Congress's intent to make it harder for a student to shift his debt responsibility onto the taxpayer".[21] Most recently, and, from a theoretical perspective, most troublingly,[22] the 2005 amendments to the U.S. Bankruptcy Code — overruling the recommendations of the National Bankruptcy Review Commission to scrap nondischargeability[23] — now make student debt nondischargeable, absent an undue hardship showing, for debts made by private lenders, not just for federally funded or guaranteed loans.[24]

Thus, the current state of bankruptcy law in the United States is that student debt, whether private or publicly financed, is nondischargeable in personal bankruptcy, with a safety valve for the showing of undue hardship (with the burden for so showing placed on the debtor).

### III. POSSIBLE THEORIES FOR NONDISCHARGEABILITY

U.S. bankruptcy law treats student loans as nondischargeable debts. Why is that so? There are several plausible theories under which educational debt should be treated as nondischargeable. In considering them, it will be helpful to remember that nondischargeability is an extraordinary rule,[25] often held out for extraordinary debts (such as, for example, an intentional tortfeasor's debt for a damages or restitution award to her victim).[26] Thus a theory of nondischargeability should make a case for treating student debt not just harshly, but exceptionally — different from all other debts. This section explores six such theories.

---

20. See Higher Education Amendments of 1998, § 971, Pub. L. No. 105-244, 112 Stat. 1581, 1837 (1998).
21. *In re Cox*, 338 F.3d 1238, 1242 (11th Cir. 2003).
22. The reason this final innovation is so troubling from a theoretical standpoint is that the extension of protection to private lenders eviscerates one of the plausible justifications for nondischargeability in the first place (safeguarding the public fisc). See *infra*, text accompanying footnotes 68-69.
23. National Bankruptcy Review Commission Report, Pub. L. No. 103-394, at 207 (established pursuant to the Bankruptcy Reform Act of 1994) (October 20, 1997). A former Republican Congressman, Caldwell Butler, was a chief proponent behind scrapping nondischargeability as unprincipled and unwarranted.
24. See 11 U.S.C. § 523(a)(8)(B) (2005, as revised).
25. See 11 U.S.C. § 727 (2005) (providing generally for the discharge of unsecured debts).
26. See 11 U.S.C. § 523(a)(6) (2005).

## 1. Fraud

One long-standing reason for holding bankruptcy debts non-dischargeable is fraud.[27] Accordingly, one theory for subjecting student loans to a nondischargeability rule is an assumption that they are presumptively fraudulent. This would in turn assume that the prototypical student loan debtor — a student — is presumptively dishonest. Is such distrust of students plausible? Of course it is. After all, they are quite lazy, they don't cut their hair enough, and most of them wouldn't recognize eight o'clock in the morning if it slapped them backside the head.[28] No one should trust them. The reader who might think this exaggeration, or that such stereotypes, while maybe whispered behind closed doors, would never influence the law, should consider the Third Circuit's recent admonition to "account for the fact that one of the most common reasons student-loan debtors find themselves in bankruptcy court is that their 'subjective value judgements' are often (but not always) indicative of a spendthrift philosophy".[29] Apparently, the judiciary has taken notice of the dubious financial mores of students.

Fraud, in its strict sense, is a serious allegation. It requires scienter.[30] To say that a loan is fraudulent is to say, or postulate as a rule of thumb, that students intend to take out huge sums of money with no intention whatsoever, from the *ex ante* perspective, of ever paying them back. While it may be a dramatic assumption, it is one that would provide a sound theoretical basis for a nondischargeability rule. Of course, whether it is a *warranted* assumption is a separate question. As Rep. O'Hara complained in (unsuccessfully) fighting the introduction of student loan nondischargeability back in the 1970s, "No other legitimately contracted consumer loan, applied to a legitimate undertak[ing] is subjected to the assumption of criminality which this provision applies to every educational loan."[31]

---

27.  See *Twyne's Case*, 3 Co. Rep. 80b-81b, 76 E.R. 809, 811-14, *sub nom. Chamberlain v. Twyne*, Moo. K.B. 638, 72 E.R. 809 (Star Chamber 1601).
28.  Except, of course, those who have yet to retire by that hour. I speak from research, not experience.
29.  *Penn. Higher Educ. Assistance Agency v. Faish (In re Faish)*, 72 F.3d 298, 304 (3d Cir. 1995).
30.  *Restatement (Second) of Torts* § 526 (1977) (Conditions under which Misrepresentation Is Fraudulent (Scienter)).
31.  See H.R. Rep. No. 94-1232 (1976) and H.R. Rep. No. 95-595, at p. 149 (1977). It is unsurprising that Rep. O'Hara called the provision "discriminatory".

A final, empirical point is critical for making student loans nondischargeable under a strict fraud theory. The Bankruptcy Code already has anti-fraud provisions, such as § 523(a)(2),[32] that expressly exempt from discharge debts incurred through fraud. For the presumption of fraud unique to student loans under § 523(a)(8), one must be making further empirical claims: perhaps that students are an especially likely group to engage in financial fraud and/or that they are an especially competent group of tricksters, making their fraud more difficult to detect than that of others. Such an account would explain the need for a special presumption of fraud when the debtors are students above and beyond § 523(a)(2). Needless to say, this piles empirical supposition upon empirical supposition, and Congress is already on shaky ground regarding empirical data and bankruptcy legislation. But this reasoning is the only way to make sense of a student loan nondischargeability provision if the underlying concern truly is the traditional one of fraud. It may not be persuasive, of course, but it is at least a theoretically articulable rationale for nondischargeability.

### 2. Soft Fraud

A more likely fraud-animated foundation for nondischargeability of student debt is what might be called "soft fraud", although that is an imperfect label. "Opportunism" also captures the concern, but that too is problematic because "opportunism" is a notoriously amorphous concept in bankruptcy. One man's shrewd financial planning around the contours of the law is another's shameless abuse of the spirit and intent of safeguards that provide succor to the "honest but unfortunate" debtor so prototypical to judicial opinions deciding in the debtor's favor.[33] "Opportunism" also invokes the always nettlesome role of morality in insolvency laws, a complex topic that will never go away, to the ongoing frustration of economists.[34] In any event, the opportunism concern of "soft" fraud is as follows: Perhaps without the malice aforethought of traditional fraud, Student takes out a six-figure loan to finance her undergraduate and graduate education. (Commonwealth readers may shudder that this debt load is not uncommon for newly minted lawyers in the

---

32. 11 U.S.C. § 523(a)(2).
33. *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934) (citing *Williams v. U.S. Fidelity & Guaranty Co.*, 236 U.S. 549, 554 (1915)) (deciding in favor of debtor).
34. "Moral hazard" might also do as a label.

United States.)[35] Her first year out into the real world, however, hardens her. She realizes she faces the prospect of amortizing a multi-decade loan, when she has few personal assets to her name other than well-highlighted law books. She has no appreciable savings (as a rational life cycle consumer, she had no inclination to accrue them yet), no home, and perhaps a beat-up car at best. But she has lots of difficult-to-monetize, let alone liquidate, human capital in the form of her J.D. degree.[36] Recognizing that the price exchanged for the bankruptcy discharge is giving up all her non-exempt assets, she happily trades in the car for unfettered access to that high future income stream. There is a perverse temporal arbitrage of sorts. She gets to pick her debt relief at the point in time when her realizable assets and present income are at their lowest and her debt and future income are at their highest. Her impecunity is transient and arguably artificial.

Does likening this rational economic behavior to fraud seem hyperbolic? No, this scenario is cast as fraud frequently. Consider the comments of Rep. Ertel, nondischargeability's champion: "At a time when political, business, and social morality are major issues, it is dangerous to enact a law that is almost specifically designed to encourage fraud." He summed up his support for nondischargeability:

> If Student A elects to repay the loan, honoring the legal and moral obligation that was incurred, he begins his career with a substantial debt and the accompanying financial pressure. Meanwhile Student B (who chooses to declare bankruptcy) can begin with a clean slate and is free to spend his initial earnings on other items . . . The lesson that Student A and B have learned is that it "does not pay" to honor one's debts or other legal obligations.[37]

Hence it is the buy-low, sell-high opportunism that is begrudged by proponents of nondischargeablity. Indeed, the concern is not unique to Americans. Ben-Ishai reports similar sentiments from Canadian politicians, such as, "We are trying to avoid situations where someone declares bankruptcy simply to get rid of their [*sic*] student loan and then finds a job."[38]

---

35.  Again, using my own institution, the University of Michigan, as an example, recent tuition for law school (a three-year graduate degree) was $35,920 per year ($32,920 for Michigan residents).

36.  Difficult does not mean impossible. See *infra*, footnote 44.

37.  H.R. Rep. No. 95-595, at p. 536, reprinted in 1978 U.S.C.C.A.N. 5963, 5424.

38.  Canada, Senate, Proceedings of the Standing Senate Committee on Banking, Trade and Commerce Issue 13 — Evidence (November 4, 1996) (Mr. Tobin), discussed in Ben-Ishai, *supra*, footnote 9, at p. 228.

The concern must be more than just a fear of opportunism *per se*. Many debts incurred can be more or less reduced to this reasoning of opportunistic discharge in bankruptcy. In fact, in business, far from being disparaged as fomenting "opportunism", the bankruptcy discharge is styled as fostering "entrepreneurialism".[39] So, again, there must be something specific to *student* loans that raises the spectre of abuse in justifying a nondischarge rule. What distinguishes student loans from other debts, vis-à-vis opportunism? First, the debtors are students, so they are usually (but not always) young. That means they have more earning years to repay their debts than the median consumer debtor, who in the United States according to most recent data is in his late thirties.[40] Second, the debt's proceeds are special. Educational debt in part reflects personal investment in future earning potential. Students will be able to realize the benefit of education and translate that benefit into financial payoff.[41] There is no serious doubt of the correlation between education and income.[42] It is thus unsurprising

39. See Wei Fan and Michelle White, "Personal Bankruptcy and the Level of Entrepreneurial Activity" (2003), 46 J.L. & Econ. 543 (finding correlation between discharge leniency and entrepreneurial activity). Note that even the increasing dominance of a blanket security interest (see Jay L. Westbrook, "The Control of Wealth in Bankruptcy" (2004), 82 Tex. L. Rev. 795) does not squelch this trend entirely due to the pervasiveness of unsecured credit in small business financing: see Ronald J. Mann, "The Role of Secured Credit in Small-Business Lending"(1997), 86 Georgetown L.J. 1.

40. See *Consumer Bankruptcy Project III* (2001 empirical study spearheaded by Professors Elizabeth Warren, Jay L. Westbrook and Teresa A. Sullivan). Data on file with author. For more information about the Consumer Bankruptcy Project, see Warren and Tyagi, *supra*, footnote 3.

41. This is not always so, as a recent academic study revealed an ugly trend of selling to low-income vocational workers educational courses that generate no substantial income-improving possibilities. See Pardo and Lacey, *supra*, footnote 14, at p. 41 and note 211, discussing a large number of bankrupted former "students" who did not even earn an undergraduate degree. This problem may be a recurrence of an earlier trend that led to Senate investigations and ultimate accreditation crackdowns on certain for-profit vocational schools. See Jodi L. Edelson, "Higher Education to Higher Default: A Re-Examination of the Guaranteed Student Loan Program" (1992), 11 Ann. Rev. of Bankr. L. 475 at p. 483 and note 62 (discussing Permanent Subcommittee on Investigations of the Comm. on Gov't Affairs, Abuses in the Federal Student Aid Programs, S. Rep. No. 58, 102d Cong., 1st Sess. 2-3 (1991)). I myself recently received an urgent message advising that "*no one* is turned down" for degrees from "prestigious non-accredited [*sic*] universities." (unsolicited e-mail to author, April 18, 2006).

42. See, *e.g.*, Thomas Lemieux, *Post-Secondary Education and Increasing Wage Inequality*, NBER Working Paper No. W12077 (May 2006) (ssrn.com abstract = 888279).

that doctors and lawyers fit well into the myth of the "abusive" student debtor. (Few rail against abusive teachers.)[43] Finally, there is inalienability. It is difficult to divest the debtor of an educational benefit *ex post*. Liquidation of an M.D. degree would be an unruly affair, and few if any jurisdictions allow licences to practice medicine to be assignable.[44]

These potentially unique features of educational debt vis-à-vis opportunism are simply the starting point to a possible theory of nondischargeability. They should not be seen as a description of reality. Indeed, if anything there seems to be a documented *lack* of empirical evidence supporting routine abuse by rich-career students using bankruptcy just out of school. The General Accounting Office study, for example, found only seven attorneys and five doctors of the 411 employed debtors.[45] The myth is seductive and persistent, however, perhaps revealing an under-current of American paranoia that we are all suckers and that rich guy down the street is getting ahead by gaming the system. Moreover, a certain circularity of reasoning renders near-impossible complete conversion of sceptics. Naysayers can seize Pardo and Lacey's data to "prove" that nondischargeability works and that were § 523(a)(8) absent, legions more doctors and lawyers would be clogging the bankruptcy courts.[46] But let us defer critique. For now, the task is simply to lay out articulable theoretical foundations for treating student loans as nondischargeable in a bankruptcy system. Here, it is that student loans are subject to "opportunistic" discharge in bankruptcy due to their unique characteristics.

---

43. But *cf. In re Gerhardt*, 348 F.3d 89 (5th Cir. 2003) (excoriating and denying discharge to cellist). Cellists are poor in an economic sense but in a sociological sense probably enjoy a relatively high occupation prestige ranking. Under the 1980 census occupational code categories, "musicians" were scored 47 in 1989, putting them on par with "public relations specialists" (48), well below "law teachers" (74), but well above "cashiers" (29). See *National Opinion Research Centre: General Social Survey Codebook, Appendix F, 1980 Census Occupational Category*, online at <http://webapp.icpsr.umich.edu/GSS/>. This discussion's analysis will stay focused on the economic perspective.

44. Note that it is not impossible. Family law sometimes must monetize in divorce cases the value of a professional degree. See, *e.g*, *Woodworth v. Woodworth*, 337 N.W.2d 332 (Mich. App. 1983).

45. See H.R. Rep. No. 95-595, at p. 143, reprinted in 1978 U.S.C.C.A.N. 5963, 6104. Pardo and Lacey found 13 lawyers with a median reported income of $32,500 in 2003 dollars in their 261 motions. See Pardo and Lacey, *supra*, footnote 14, at p. 41.

46. A reply to this argument is that § 523(a)(8) motions are for discretionary relief for undue hardship, so there is nothing in existing law that stops doctors and lawyers from bringing them now, as the eight reported cases did.

### 3. Internalization

It is admittedly difficult to carve out discrete justifications for student debt treatment in bankruptcy, because many reasons overlap. Nevertheless, a separate but related ground to opportunism for treating student loans as nondischargeable can be thought of as "internalization". This theory builds on the notion that the recipient of a private benefit (here, education) should have to bear its cost (here, the debt for tuition).[47] Again, this argument can be extrapolated to almost all debts, so one must further find something distinctive about education in particular that makes internalization a special concern.

First of all, what are the private benefits of education conferred upon the recipient? There are at least two that come to mind. First, there is the simple enjoyment ("subjective utility" in economic parlance) of engaging in a purely intellectual endeavor for several years. That may well be important, but academics probably accord it disproportionate focus. The more tawdry and tangible private benefit to education is, as alluded to above, the financial empowerment of heightened earning potential that attends a post-secondary degree. Most of the public rhetoric seems targeted at this sort of benefit, likely because it ties closely with the financial opportunism of quickly discharging the educational debt incurred to achieve it. For example, in the recent Rae Review in Canada, the Hon. Bob Rae, in advocating the ability of universities to set their own (higher) tuition rates — and to require loans for students to help pay those higher rates — reasoned that there is "an important private benefit to the student and the graduate [to education and attending university]. It is only reasonable for students to pay part of the cost. Otherwise we would be asking the taxpayers who don't go to subsidize those who do."[48] This language repeats an idea articulated by

---

47. Obviously, by publicly subsidizing the student loans programme in the United States, some costs are "externalized" by deliberate social intervention — the subsidy. The argument here is that excessive bankruptcy discharge is an unfair "over-subsidy" that allows, effectively, free education where the legislator wanted only loan-subsidized education. The perceived socially optimal level of activity is overshot.

48. Bob Rae, *Postsecondary Review: Higher Expectations for Higher Learning* (report and recommendations submitted to the Premier by the Minister of Training, Colleges and Universities, February 2005) at p. 24 (hereafter "Rae Review"). I am deliberately taking Rae's comments out of context. He prefaces his comments by recognizing the "significant social benefit" of education: *ibid.*, at p. 23.

Australian politicians when tuition fees were introduced to students in 1989.[49]

It is therefore understandable that if one envisions education as a private benefit, and specifically one that accords financial gain, then one may legitimately worry about the spectre of opportunism and externalization. If tuition debt is publicly subsidized and then discharged, the benefit is realized privately but the cost is shifted back to the public.[50] Indeed, some enthusiasts of "constructing"[51] education as a private benefit go even further. Here, it is not even higher earning, but the *chance* for higher earning, that is the private benefit of education. The unsuccessful lawyer must bear that cost just as much as the successful one, lest the taxpayer fall into the role of guarantor of financial success (of lawyers!).[52] At the furthest extreme, some even begrudge education that has *no* potential to translate into a lucrative career. For them, "nothing in the Bankruptcy Code suggests that a debtor may choose to work only in a field in which he was trained, obtain a low-paying job, and then claim it would be an undue hardship to repay his loans".[53] Taking aim at musicians, such as the principal cellist of the Louisiana Philharmonic Orchestra who brought the unsuccessful discharge motion that generated the preceding pronouncement, one court worried that otherwise "it is difficult to imagine a professional orchestra musician who would not qualify for an undue hardship discharge".[54]

---

49.  See Ben-Ishai, *supra,* footnote 9, at p. 232 (citing A. Usher, *Much Ado About a Very Small Idea: Straight Talk on Income Contingent Loans* (Toronto, Educational Policy Institute, 2005), at p. 3, online at: <http://www.educationalpolicy.org/pdf/ICR.pdf>).

50.  Perhaps one might consider the public as having an equitable lien on the degree.

51.  This is Ben-Ishai's term, which is exactly right — it is a choice of how to conceptualize education. See Ben-Ishai, *supra,* footnote 9, at p. 237.

52.  See *In re Roberson,* 999 F.2d 1132 (7th Cir. 1993), quoted in text, *infra,* at footnote 58. These cases seem to sidestep the difficult moral issues involved in "exogenous" career failure. For example, are the purposes of educational debt nondischargeability engaged or perverted when an elite law school student graduates with ample debts but then falls victim to mental illness that restricts her earning capacity? See *Reynolds v. Pa. Higher Educ. Assistance Agency (In re Reynolds),* 425 F.3d 526 (8th Cir. 2005) (en banc) (upholding mentally ill debtor's discharge for law school debt notwithstanding discretionary income because repayment of debt over time would so compromise debtor's mental functioning as to constitute an undue hardship), cert. denied 2006 U.S. Lexis 5716.

53.  *In re Gerhardt,* 348 F.3d at 93 (*per* Edith Jones J.).

54.  *Ibid.* Jones J.'s opinion for the court contained neither outrage that it costs $77,000 to be trained as a principal cellist for a major orchestra but the position can only generate $1,680 in monthly wages, nor a call for greater subsidies for symphonic orchestras. It

Talking about the private benefits of education draws into its sharpest relief the comparative nature of the Ben-Ishai survey. While Ben-Ishai generally sees convergence across legal regimes (which to be sure there is),[55] from the American vantage point it is actually the conceptualization of higher education as a public, or even predominately public, as opposed to private benefit that seems most jarring. In the United States, talk of the public benefit of higher education — or even the positive externalities associated with the private benefit of higher education — is notoriously absent from the bankruptcy jurisprudence.[56] Instead, one sees comments preoccupied with the monetization of degrees, complete with finance jargon, to the exclusion of a broader social understanding of education. Consider as an example, the Seventh Circuit's LBO analysis:

> The government is not twisting the arms of potential students. The decision whether or not to borrow for a college education lies with the individual; absent an expression to the contrary, the government does not guarantee the student's future financial success. If the leveraged investment of an education does not generate the return the borrower anticipated, the student, not the taxpayers, must accept the consequences of the decision to borrow.[57]

This stands in stark contrast to the Commonwealth. The jaws of most American readers would drop (and, if one assumes that they are academics, and hence very likely to be university graduates,

---

did, however, fault Gerhardt for not being creative and choosing to work, for example, as a night-school teacher or a music store clerk. See *ibid.*, at pp. 92-93 and note 4.

55.  See Ben-Ishai, *supra*, footnote 9, at pp. 215 and 224-26.

56.  This is not to say that the idea of education as a public benefit is absent from American academic discourse. For a seminal example, see Burton A. Weisbrod, *External Benefits of Public Education* (Princeton, Princeton University Press, 1962). It is the courts who seem to give it short shrift. By contrast, economists seem quite excited of late about isolating and quantifying the externalities of education. See, *e.g.*, A. Ciccone and G. Peri, "Identifying Human Capital: Theory with Applications" (2006), 73 Rev. Econ. Stud. 381; E. Moretti, "Estimating the Social Return to Higher Education's Evidence from Longitudinal and Repeated Cross-Sectional Data" (2004), 121 J. of Econometrics 175; D. Acemoglo and J. Angrist, "How Large Are the Social Returns to Education: Evidence from Compulsory Schooling Laws" in Ben Bernanke and Kenneth Rogoff, eds., NBER *Macroeconomic Annual 2000*, pp. 9-59. For an interesting recent treatment disaggregating secondary education effects from post-secondary education effects (on the theory of imperfectly substitutable skilled/unskilled workers as factors of production), see S. Iranzo and G. Peri, "Schooling Externalities, Technology and Productivity: Theory and Evidence from U.S. States", NBER Working Paper Series No. 12440 (2006), online at <www.NBER.org/papers/w12440> (measuring externalities as change in total factor productivity net of wages in finding significant social returns to post-secondary education but not average education levels).

57.  *In re Roberson*, *supra*, footnote 53, at p. 1137.

drop with jealousy) upon learning that Australia did not even charge students tuition until 1989.[58] Similarly, in Canada, the February 2005 Rae Review presented the seemingly bold idea that student tuition should be vastly increased, decoupled from its utility-like government regulation, and that students should be required to incur (albeit publicly subsidized and guaranteed) debt to help afford it. In fact, the quotation from the Rae Review above, used to illustrate a private construction of education, actually began with the prefatory admonition that "there is unquestionably a significant social benefit to higher education that should be recognized by a stronger commitment to public funding".[59] Accordingly, while Ben-Ishai suggests convergence, there may actually be two sharply divergent starting points, which may well reflect deeper normative differences regarding the role of higher education within society.[60]

Thus if, but only if, higher education is conceived as a private benefit that inures exclusively or predominately to the student, and if its cost is publicly subsidized, then an internalization argument can be made to anchor another possible theory of nondischargeability.[61]

### 4. Shaming

This articulation of theories strives to be comprehensive, so it should also add the expressive, normative reason for refusing to discharge student debts: shaming. Treatment may be brief, however, because it is doubtful that this model grounds the justification for the student loan nondischarge.[62] It nevertheless deserves a place at the table as a logically coherent rationale. The argument is that students fall into a class of morally deficient debtors whom society wants to stigmatize and punish for non-economic reasons. Indeed, as mentioned, a paradigmatic

---

58. See *supra*, footnote 49.
59. Rae Review, *supra*, footnote 48, at p. 23.
60. Indeed, with the United States' most recent crack-down on students in the 2005 amendments, Canada, to the extent it is "converging" on a U.S. approach, is actually chasing a moving target that is drifting further away from the status quo.
61. Again, this argument could be applied to many other unsecured debts.
62. This would have to be "special" shame, above and beyond the baseline indignity of filing for bankruptcy. See Udo Reifner, Johanna Kielsilainen, Nik Huls and Helga Springener, *Consumer Overindebtedness and Consumer Law in the European Union: Final Report* (2003) (Contract Ref. No. B5-1000/02/000353 to the Commission of the European Union Communities, Health and Consumer Protection Directorate-General), at p. 66 (discussing feelings of "guilt and shame" debtors have in filing for insolvency and how some creditors prefer to exploit this in pressing for publicized, statutory adjustments of debts over voluntary arrangements).

nondischargeable debt is the intentional tortfeasor's.[63] This is not premised on economic arguments of cost-spreading (there is little to suggest that negligent tort victims can cost-spread or insure any better than intentional tort victims) or other traditional arguments that justify priority and nondischargeability rules. Rather, it is an expression of the special disgust society has in using the bankruptcy system — that finds its origin in equity — to leave the tort victim without recovery in the service of a fresh start for her malicious tortfeasor. Clean hands are required for the discharge accorded the "honest but unfortunate debtor".

Note that despite recent political rhetoric,[64] stigma is alive and well in insolvency — such as in Australia, where adjudicated bankrupts cannot leave the country without written permission and are barred from governing corporations.[65] So could it be that society wants to single out students in particular for special shame in falling into financial ruin and that a desire for disapprobation explains the current Bankruptcy Code's treatment? Consider New Zealand, an otherwise student-friendly jurisdiction. It specifically punishes bankrupt student debtors by barring them from getting more money from the government student loan programme, thus taking legal pains to prescribe student-specific bankruptcy prohibitions.[66] Nevertheless, a desire to shame students through the bankruptcy system as special scourges seems an unlikely, if arguably possible, theoretical basis for a nondischargeability rule.[67]

---

63. See 11 U.S.C. § 523(a)(6). ("[D]ischarge . . . does not discharge an individual debtor from any debt . . . for willful and malicious injury by the debtor to another entity or to the property of another entity.").

64. See *infra*, footnote 110 (comments of Sen. Sessions).

65. See the Appendix to the Ben-Ishai article (unpublished in this journal, on file with author), citing Australian authorities.

66. See *ibid.* (citing New Zealand authorities). This punishment is targeted specifically at student debtors because presumably only student debtors want access to and are eligible for student loans.

67. Shaming is an unlikely explanation because the 1978 Code had as one of its objectives *reducing* the stigma attached to bankrupt debtors. For example, it deliberately replaced the term for the petitioner from "bankrupt" to "debtor" as a "means of reducing the stigma associated with the term bankrupt". See H.R. Rep. No. 95-595, at p. 310 (1977). On the other hand, a "soft" shaming — or perhaps a "jealousy" — point could be read into the student loan rules: that they come out of irritation with students who pursue high-cost degrees not because they are *necessary* to get low-income jobs, but because they are *preferred* to lower cost degrees at "lesser" schools that could provide sufficient training for the same jobs. See generally Robert Tomsho, "Saying 'No' to the Ivy League: Families Face Tough Choice as Back-Up Schools Boost Merit Aid for

## 5. Public Fisc

A wholly different justification for treating student loans as nondischargeable in bankruptcy proceedings is couched in terms of "protecting" the solvency of the public student loan programme, which is perceived to be in a crisis.[68] It is usually cast in terms of incentives. It starts with the premise that the default and write-off rates of these loans will presumably have some negative correlation with the attractiveness to the debtor of how those loans are treated in bankruptcy, at least to the extent of some endogenous component to the decision to file bankruptcy (*i.e.*, to the extent one "chooses" and is not completely "forced" by exogenous forces to file bankruptcy). If bankruptcy law treats student loans leniently, then more students at the margin will be inclined to "take bankruptcy" and discharge their loans. And if more students discharge their federally insured loans in bankruptcy, then more federal dollars will be devoted to bailing out failed loans (and reimbursing guaranteed lenders) than might otherwise be devoted to making initial loans to new students. Here, bankruptcy policy becomes an indirect lever for education policy. If bankruptcy policy can be altered to make it harder to default on student loans (*e.g.*, changing otherwise dischargeable debts to become nondischargeable), then incentives will change. Presumably the default rate on the loan portfolio as a whole, or at the very least the write-off rate of those loans in bankruptcy, can be diminished, freeing up scarce government dollars for new students and new loans. The theory finds a cognate in some of the traditional law and economic analysis of the role corporate bankruptcy law can play in the cost of private capital.[69] While it rests in part upon an important assumption regarding the volitional nature of filing for bankruptcy that is subject to some debate, it is at least an internally coherent account of nondischargeability.

## 6. Cost of Private Capital

There is a final theoretical basis for treating student loans as nondischargeable in bankruptcy, and it is one that seems not to be

---

Top Students", *Wall Street Journal*, April 20, 2006, p. D.1. This is a possible non-economic interpretation, but it seems to cut against the access-opening animation of guaranteed student loans in the first place: that the poor should be able to attend institutions previously accessible only to the rich.

68. See Ben-Ishai, *supra*, footnote 9, at pp. 229-31.

69. See, *e.g.*, Alan Schwartz, "A Normative Theory of Business Bankruptcy" (2005), 91 Va. L. Rev. 1199.

discussed much. It hearkens back to the economic point just implied regarding the insolvency-state payoff to the lender.[70] If an otherwise dischargeable unsecured debt is rendered nondischargeable by the law, then the bankruptcy-state scenario regarding that debt becomes worse for the debtor (it does not go away) and better for the lender (it does not go away). In a world of competitive, zero-profit lending markets, this increased payoff for the lender must be translated *ex ante* into an improved cost of capital for the borrower. Without addressing the empirical likelihood of this competition, it suffices to observe that making bankruptcy harsher for the debtor, at least from the standpoint of economic theory, makes borrowing more affordable for that debtor in particular and all borrowers generally (especially in a world where it is difficult or expensive to distinguish good from bad borrowers up front). While this theory for nondischargeability is similar to the prior discussion of the publicly funded student loan programme, it has a key difference. With the subsidized public programme, one assumes finite apportioned capital from a legislature, or at the very least one assumes political constraints on budgetary prioritization. By contrast, with a robust private lending market, one can assume a bountiful capital supply available for loans. Recall that in the public student loan market, interest rates are set in a tariff-like structure and mandated by federal entities that impose restrictions on loan terms and are subject to financial constraints.[71] (To be sure, the rates float as a function of benchmark market interest rates, but the adjustment from the designated index rate has traditionally been fixed.)[72] In the purely private market, the economic consequence of increasing bankruptcy discharges of loans should be for lenders to price up their interest rates (which they can do in a free market, unconstrained by government tariff regulation), or to credit ration or exit the market altogether. Thus nondischargeability could be justified as an attempt to make private loans "cheaper" for students.[73]

---

70. *Ibid.* The discussion in the text explores only supply; there could be countervailing considerations of demand.

71. For an example of a loan term restriction, see 20 U.S.C. § 1087(d) ("If a student on whose behalf a parent has received a loan described in section 428B [20 U.S.C.S. § 1078-2] dies, then the Secretary shall discharge the borrower's liability on the loan by repaying the amount owed on the loan.").

72. See Chaker, *supra*, footnote 4, at p. D1. Note, however, that Congress has just voted to change the interest rates to move away from the index-based formula somewhat: *ibid.*

73. The same logic taken to its extreme counsels allowing the debtor to become even better off by pledging a pound of flesh as security. See generally William Shakespeare,

This economic argument cannot be limited to educational loans. All loans would follow this logic. So it may prove a difficult basis for justifying a special rule of nondischargeability for student debt. But it is theoretically sound if one wants to make only a certain type of debt (here, student loans) cheaper and comparatively more attractive than other debt (for example, consumer credit card loans). If one relaxes the assumption of competitive credit markets, however,[74] then nondischargeability turns from a purportedly student-friendly provision into an easy way for a creditor to enhance his return by tinkering with the bankruptcy laws. It is therefore not surprising that many private creditor constituencies jockey for nondischargeability status when bankruptcy laws get amended (which public choice scholars will remind is easier for concentrated, focused groups to do).[75] For example, when an amendment to expand nondischargeability to for-profit student loan lenders was first proposed (unsuccessfully) in the 1978 Code, a displeased group of non-educational creditors grumbled that "this proposed change simply suggests that if sufficient political pressure can be generated, a special interest group can obtain special treatment under the bankruptcy law".[76] This public choice grievance of lobbying run amok was levied by the American Bankers Association and Consumer Bankers Association Task Forces on Bankruptcy. That is correct: the *banker's associations* complained about the ability of private interest groups to co-opt the Bankruptcy Code.[77]

### 7.  Second-Order Considerations

The foregoing discussion presented an array of plausible theoretical foundations for treating student loans as nondischargeable in

---

*The Merchant of Venice*, Act IV, Scene I (applying doctrine of *contra preferentum* in collection proceedings).

74. Or if one questions the ability of the insolvency-state payoff to affect *ex ante* conduct in a meaningful way. See Ronald J. Mann, "Strategy and Force in the Liquidation of Secured Debt" (1997), 96 Mich. L. Rev. 159 at p. 242 (quoting interviewed bank officer as saying bankruptcy does not matter "one iota" to how banks initiate loans).

75. See Mancur Olson, *The Rise and Decline of Nations: Economic Growth, Stagflation, and Social Rigidities* (New Haven, Yale University Press, 1982). For legal application, see Einer R. Elhauge, "Does Interest Group Theory Justify More Intrusive Judicial Review?" (1991), 101 Yale L.J. 31 at p. 43.

76. H.R. Rep. No. 95-595, at p. 150 (1977), reprinted in U.S.C.C.A.N. 5963, 6111, quoted in Ben-Ishai, *supra*, footnote 9, at p. 239 (internal citations omitted).

77. I think it is fair to say they got the last laugh. See, *e.g.*, 11 U.S.C. § 707(b) (2005, as revised).

personal bankruptcy proceedings. A brief "second-order" analysis is also warranted regarding administration. One could accept (or reject) any number of the prior justifications for exceptional treatment of educational debt in bankruptcy but then quarrel over how best to implement the chosen theory in drafting the law. What is striking about the U.S. system, especially in light of the recent shift toward the rule-based discretion-stripping of bankruptcy judges,[78] is the express grant of discretion to judges to adjudicate student-loan dischargeability motions under § 523(a)(8). For purposes of simplicity, student debt has been called nondischargeable in this article. In actuality, it is conditionally dischargeable: the judge may discharge the debt if she determines that failing to discharge it would impose an "undue hardship" on the debtor.[79] Why, one must wonder, would Congress leave such an open-ended grant of discretion for the judge to wrestle with and an undefined standard for the courts to fill in?[80] And why, if any (or all) of the justifications for making student loans nondischargeable hold sway, would Congress want to back-pedal by allowing a judicial "out" from nondischargeability? Could it be that Congress got cold feet with its seeming tough talk on student debtors? Could it be a legislative recognition of the cognitive imperfections that might lead student borrowers to overestimate their capacity to repay extensive debts? Could it reflect a last-minute realpolitik compromise? Or could it just be an aversion to bright-line rules in a legal system originated in equity?[81]

The curiously open-ended operation of § 523(a)(8) doubtless animated Pardo and Lacey's empirical investigation into 261 reported decisions involving undue hardship motions. Their analysis produced several findings worth mention. First, about half of the motions were granted.[82] Therefore at the outset, when considering

---

78. See *ibid.*

79. 11 U.S.C. § 528(a)(8).

80. And fill it in the courts have. The reigning "undue hardship" test is a three-pronged one announced in *Brunner v. New York Higher Educ. Servs. Corp*, 832 F.2d 395 (2d Cir. 1987) (minimal standard of living, persistent state of affairs and good faith attempt to pay).

81. It bears remembering that the undue hardship test has been around since there was a time-lapse rule of only five years for discharging student debt. So if there were cold feet, they started out especially cold, where even five years seemed too harsh a bar to impose without a safety valve.

82. See Pardo and Lacey, *supra*, footnote 14, at p. 70 (reporting 45.5% rate of "undue hardship" findings and 57% rate of at least some granted relief).

the purportedly nondischargeable nature of student debt in the United States, one must realize that a non-trivial amount of it does, in fact, get discharged in bankruptcy.[83] Second, there is disquieting randomness in the application of the undue hardship standard, notwithstanding the doctrinal tests various appellate courts have propounded to try to routinize the enquiry.[84] When dividing the debtors into the group whose debts were discharged vs. not discharged, Pardo and Lacey were hard-pressed to find significant demographic differences (with an exception involving work-limiting medical conditions, which correlated positively with granting undue hardship discharge).[85] Third, a disjunct exists with respect to evidence and analysis, with courts often denying discharge if they determined that there was a current or future ability to repay the loan, but not always analysing the debtor's financial situation in coming to such conclusions.[86] Finally, judges' opinions on whether a given debtor received a financial benefit from his education correlated with their assessments of whether that debtor had a future ability to repay the debt (and hence would not face undue hardship).[87] The data gathered by Pardo and Lacey thus present a mixed bag of conclusions regarding how § 523(a)(8) works on the ground. On the one hand, they show judges trying to use principled criteria, such as perceived future ability to pay. On the other hand, statistical analysis suggests some arbitrary implementation by even well-meaning judges. At the very least, their data should give pause with a judicially administered, *ex post*-focused system, whatever its underlying justificatory rationale.

## IV.  CRITIQUE AND RECOMMENDATION

Having explored the various theories under which student debt should be treated as nondischargeable in bankruptcy, the next task is to critique these theories and gauge how well the regime in the United States comports with any of them.

---

83. This observation implicitly assumes no relevant selection bias in the cases that get to the reported decision stage. That is, presumably there were a large number of clear losers in which debtors never bothered to make motions for relief, just as there were a large number of clear winners in which a motion was made and left unopposed (or deemed unworthy of publication).

84. See, *e.g.*, *Brunner*, 832 F.2d 395; *In re Long*, 322 F.3d 549 (8th Cir. 2003).

85. See Pardo and Lacey, *supra*, footnote 14, at pp. 71, 77 and Table 8.

86. See *ibid.*, at p. 93.

87. See *ibid.*, at p. 96 and Table 13.

First, with regard to the hard fraud theory, the current provisions of § 523(a)(8) seem well designed. They expressly target student debtors for discriminatory treatment for their presumptively fraudulent behaviour. The fatal problem is that there are no compelling empirical data to buttress the myth that students defraud creditors any more than other debtors.[88] Thus hard fraud becomes difficult to take to heart as the theoretical foundation of the nondischargeability rule. In fact, as mentioned earlier, the seminal General Accounting Office study from the 1970s indicated a lower than 1% bankruptcy rate for student debtors.[89] Furthermore, as also mentioned earlier, a special rule for student loan fraud does not even make sense; it is redundant with the general anti-fraud injunction of § 523(a)(2), and there has been no documented infirmity with § 523(a)(2) as a mechanism to police fraudulently incurred debt.

But what of the "softer" fraud — the idea of exploitative opportunism, where students rack up huge educational debts only to waltz into bankruptcy the day after graduation? Here, unlike the hard fraud scenario, the underlying justification is more convincing, especially when coupled with the closely related "internalization" theory that those receiving a private benefit should maximally bear its cost. Bankruptcy's discharge appearing as a seductive siren to a graduate receiving a $100,000 promissory note with her diploma is surely a more compelling concern than an undifferentiated allegation that students are dishonest. Indeed, it is this example that politicians invoke repeatedly when galvanizing support for nondischargeability.[90]

The problem with "soft fraud" or "opportunism" is not so much with the justification (as a theoretical matter at least — it leaves much to be desired from an empirical perspective) as it is with its execution. The U.S. Code approach, for example, is insupportably overbroad. To wit, if the animating concern with opportunism is with a "rich" (or, more precisely, "soon to be rich") debtor getting off the hook under a false façade of poverty, then a rationally

---

88. See Ben-Ishai, *supra*, footnote 9, at pp. 234-36. To be sure, there are no compelling empirical data for many issues on which Congress legislates. But this was not gay marriage. This was Congress deciding to "crack down" financially on what in all likelihood was a fictitious problem — even, remarkably, in the face of a General Accounting Office finding showing a low level of student default. See *infra*, footnote 89.

89. See General Accounting Office Report, H.R. Rep. No. 95-595, *supra*, footnote 18.

90. See Ben-Ishai, *supra*, footnote 9, at pp. 227-28.

tailored legal response would be one that took express account of this earning potential and separated the rich from the poor — an "income-contingent" model of discharge.[91] Regrettably (and regressively), the U.S. Code makes no formal adjustments for income regarding nondischargeability in bankruptcy.

This is where the comparative analysis of the Ben-Ishai study brings helpful perspective. In contrast to the U.S. (and Canadian) mortgage-style regimes, which treat student debt as a lump-sum outlay that gets capitalized at graduation and then amortized over fixed-period installment payments, countries such as Australia and New Zealand (and recently, the United Kingdom) have embraced an income-contingent model. Repayment of student debt is a variable endeavor, and a repayment "tithe" is determined by a percentage of the debtor's income.[92] Under income-contingent systems, the more a debtor earns, the more she pays toward her government-funded student debt. Poorer debtors keep paying too, of course, but with some far-off forgiveness sunset.[93] In fact, so routinized is the process that in Australia, recoupment is assigned to the tax collector, and relief for hardship is sought through administrative tax hearings rather than judicial process.[94]

There is much to commend these regimes as better capturing a theory of anti-opportunism. If the true underlying motivation for student debt nondischargeability is translation of the educational benefit received into a higher income stream for the erstwhile student, then surely the better path is one that is sensitive to whether that income stream has, in fact, materialized. Indeed, consistent with this approach, Australia subsidizes law degrees by $1,472 and agricultural ones by $15,966, suggesting, if one assumes that education in agriculture is not multiple times more expensive than

---

91. Note that the income-contingent repayment option of the William D. Ford Federal Direct Loan Program allows debtors to discharge their debts after 25 years of payment on an income-contingent plan indexed to the poverty level. For a discussion of the programme, see, *e.g.*, *In re Pena*, 155 F.3d 1108, 1114 (9th Cir. 1998). The programme's official website at the U.S. Department of Education is <http://www.ed.gov/programs/wdffdl/index.html>.

92. See Ben-Ishai, *supra*, footnote 9, at pp. 240-43.

93. In the United Kingdom, it used to be age 65, but under recent amendments it is now after 25 years of payment. The precise regulations are summarized in Ben-Ishai, *ibid.*, at pp. 240-42.

94. See *ibid.*, at pp. 240-41 (summarizing Australian procedures).

education in law, that the government expects lawyers to contribute more toward their educations than farmers.[95]

To be sure, an income-contingent approach is captured indirectly, albeit poorly, in even the Canadian and American insolvency regimes. In Canada, the waiting periods before a student debtor can seek bankruptcy relief could be envisioned as an oblique way to achieve the same effect. If the concern is a high-income lawyer-to-be masquerading as a poor recent graduate, then waiting for five years (or ten years, or seven years as Bill C-55 proposes) could be seen as a way to smoke out the false debtors.[96] After seven years, the debtor either truly is poor (and so has not been opportunistic), or is so taken with the deferral of his legal paycheque that he deserves the discharge for his efforts (he has opportunistically cut off his nose to spite his face).[97]

Similarly, the U.S. "undue hardship" test could also be seen as capturing some income-contingency. Indeed, Pardo and Lacey's study shows a strong correlation between a judge's determination of the debtor's future ability to pay his debts (an ability that can be likened to having an "opportunistic" level of income) and the *absence* of undue hardship and hence the nondischargeability of the debtor's loans.[98] Judges use the undue hardship test to back-end income-contingency into the American system — albeit in an unpredictable and expensive way.

Thus the prescriptive lesson for the North Americans is that if they are truly worried about smoking out the future doctors and combating soft fraud in bankruptcy, a more direct and principled (and less cumbersome and expensive) route would take a page from the Oceanic playbook. Moreover, what should be equally clear, from a theoretical perspective of anti-opportunism,[99] is that there

---

95. See *ibid.*, unpublished Appendix, *supra*, footnote 65 (citing Australian statistics). This analysis assumes that lawyers for the most part make more money than farmers, a fact on which I would bet the farm.

96. See *ibid.*, at pp. 221-24 for a summary of the various Canadian (proposed and actual) waiting periods.

97. This is not to disagree with Ben-Ishai's well-placed criticism of the seven-year waiting period as inappropriately orienting the presumption of abuse against the debtor: see *ibid.*

98. See Pardo and Lacey, *supra*, footnote 14, at pp. 86-87 (noting 94% correlation and constructing model).

99. And a doctrinal one too, given Pardo and Lacey's historical analysis. See *ibid.*, at pp. 13-21.

is little sense to the U.S. cases that deny the discharge of *poor* former students, such as the cellist in *In re Gerhardt*.[100] These cases do not accept the income-contingent approach — in fact, they reject it outright, bemoaning that it allows the debtor to get away with retaining a low income yet discharging his student debt.[101] This complaint leaves one nonplussed, because it is difficult to fathom the supposed moral hazard of having a low income when the underlying premise of education according a chiefly private benefit is that it permits the student to earn a higher income stream.

Indeed, this whole line of case law, at least as seen trying to implement an anti-opportunism theory, seems to rely upon a combination of difficult-to-defend propositions. It either needs a crabbed interpretation of education (a wholly private endeavor with no public component whatsoever), or it must subscribe to the notion that the private "benefit" from education is simply having enjoyed a few years of not having an honest job, regardless of the income one gets from it in the future.[102] The consequence of this reasoning is to discourage education that requires a hefty tuition load by denying the discharge if a financial "payoff" does not materialize. Most troublingly, the reasoning in this case law is not just difficult to square, but directly opposed, to the anti-opportunistic theory of nondischargeability. Recall that an anti-opportunism defense of nondischargeability was cast, in the pitch of the Australian minister, to prevent an unfair subsidy to the rich (the educated debtors) from the poor (the uneducated taxpayers).[103] Sensibly, the Australians went to an income-contingent plan to prevent this potential evil from happening. To withhold the discharge from cellists who make $1,680 per month seems to abhor not a subsidy from the poor to the rich but a subsidy from the poor to the *poor*. Actually, if one assumes that the tax regime is progressive and the subsidy would be shouldered predominantly by the rich, then the purportedly objectionable subsidy would be from the *rich* to the poor. If one is willing to accept progressively redistributive subsidies, this seems to be an awfully difficult sort of subsidy to begrudge.[104]

---

100. See *In re Gerhardt*, 348 F.3d 89 (5th Cir. 2003), summarized *supra*, at text accompanying footnotes 54-56, and discussed *infra* at text accompanying footnotes 102-103.
101. See *supra*, footnote 53.
102. A final explanation for this case law is that it is just mean-spirited.
103. See Ben-Ishai, *supra*, footnote 9, at p. 232 (citing sources).
104. What about the bad cellist, or the cellist who could pay his bills taking a traditional cellist's job, such as with a symphony orchestra, but instead chooses, for reasons of

As for the public fisc and the preservation of the federal student loan programme through sharpening students' repayment incentives with nondischargeability, a collection of problems arises. These problems are quite different from this theory's foundational assumption of bankruptcy endogeneity (that former students "chose" to file bankruptcy to deal with their student loans as opposed to being "compelled" to file by external circumstances).[105] That assumption is of course required to get this theory out of the gates, and it is a problematic one, but it has been well explored elsewhere.[106] The decision to decline repetition of its critique should not be seen as endorsing the assumption, but rather an attempt to focus on arguments that have not yet been developed in the literature.

The first difficulty with the "save the student loan programme" foundation for nondischargeability is partially logical and partially evidentiary. When scholars fret about the solvency of the student

---

subjective utility, to play only poorly remunerated "avant-garde" music that involves rubbing his cello with trout? Isn't his "undue hardship" of his own creation? Isn't he an opportunist of a different sort? The question is an interesting one. Perhaps there should be an objectivity component to undue hardship (*i.e.*, consideration of what a "reasonable cellist" would earn). That might deal with the fish-mongering musician and yet avoid the one-child policy of *Ward v. United States (In re Ward)*, No. 02-34594-H4-7 (Bankr. S.D. Tex. 2004), online at <http://weberlaw.com/pdf-files/ward-vs-dept-of-education-unpublished.pdf>, in which a student loan undue hardship motion was denied because the economic hardship was a consequence of the debtor's subjective-utility choice to have a third child. I suspect that a "reasonable parent" would not be legally required to use birth control (or abortion) to discharge student loans were such an objective test employed. Reasonable cellists cannot play trout; reasonable parents can procreate. (I am indulging in the dramatic in likening the *Ward* holding to a compulsory sterilization regime; the *Ward* judge actually fashioned creative relief that granted partial discharge for five years until the mother could go back to work and alleviate the financial distress, but his reluctant interpretation of his restricted discretion under *Gerhardt* is chilling.)

105. If, by contrast to this assumption, bankruptcy is largely "exogenous", then there is little to gain from making student loans nondischargeable. If circumstances beyond the debtor's control leave him without money to pay back his loans, blood cannot be drawn from a stone. See generally *Till v. SCS Credit*, 541 US 465, 493 (2004) (Thomas J. concurring in the judgment) (cautioning that "bankruptcy judges are not oracles and . . . trustees cannot draw blood from a stone").

106. For a recent and persuasive treatment, see Warren and Tyagi, *supra*, footnote 3. For contemporary data undermining the view that debtors strategically consider bankruptcy laws to calibrate their debt levels from an *ex ante* perspective, see the report of the U.K. Department of Trade and Industry, *Over-indebtedness Monitoring Paper Q1 2006* (DTI). The report (at p. 12) notes that after the Enterprise Act of 2002 — which made personal insolvency procedures more lenient on debtors but left cognate individual voluntary arrangement (IVA) procedures unchanged — the increase in IVAs actually outstripped the rate of (more debtor-friendly) personal insolvencies.

loan programme — and more specifically, the need to change the Bankruptcy Code to save it — they often rely on the spiraling number of student loans (both outstanding and in default) to demonstrate a sense of urgency.[107] They also tend to read causality into this growing number of loans in default, reasoning as follows: there are more students taking out loans, and more aggregate dollars in default than previously, and more loans being discharged in bankruptcy, and therefore there is a problem with bankruptcy being too attractive to students. This imperils the student loan programme's solvency.[108]

The logical problem is reading the growing number of defaulters and the growing portfolio of loans in default as evincing an overly lenient bankruptcy system. There may or may not be a problem (there likely is), but the conclusion that there is a problem with the bankruptcy system being too lenient in its treatment of student debt and too lax in its incentives for student debtors from the simple fact that the numbers of debts and discharges are increasing rests upon dubious logic.[109] (Indeed, it reiterates the argument resonating in general bankruptcy reform that because the total number of bankruptcy filers has increased over the last two decades there is a problem with the Bankruptcy Code being too lenient on debtors.)[110] A growing number of defaults, on its own, proves nothing about incentives. All it proves is that more debt is being discharged.

The deeper problem with this focus on increasing total student debt and defaulted student debt is that it is looking at the wrong

---

107. Even Ben-Ishai does this a bit. She catalogues a run-up in the number of students who file for bankruptcy with student loans and the aggregate dollar amount of student loans discharged through bankruptcy, but she does not report associated rates of tuition increase or even macro-economic trends. See Ben-Ishai, *supra*, footnote 9, at pp. 229-31. Then again, some of her data might speak for themselves. For example, she finds that the New Zealand Auditor General reported a jump to $8.5 million in write-offs from 542 borrowers versus $3.5 million in write-offs from 326 borrowers in just one year (June 2003 to June 2004): see *ibid.* In fairness, Ben-Ishai in her discussion suggests that she is simply reporting the justifications used to restrict dischargeability in presenting these statistics, not necessarily endorsing them as a basis for intervention: see *ibid.,* at pp. 235-38.

108. See *ibid.,* at pp. 229-31 and 235-38.

109. Unless the argument is the broader one of funding more generally, which is an important question, but not a bankruptcy one. See *infra,* text accompanying footnote 122.

110. For example, consider the statement on the U.S. Senate Floor of Sen. Jeff Sessions that "[i]t has been estimated that if current practices continue, one out of every seven households will have filed for bankruptcy by the end of this decade, with many of these losses as a result of the misuse of the law by irresponsible, high-income filers": 150 Cong. Rec. H143, H144 (daily ed. Jan. 28, 2004) (Statement of Sen. Sessions).

numbers. By focusing on the *aggregate dollar amount* of discharged student debt, it neglects the more important *default rate* of those loans. The confusion is understandable; *ceteris paribus,* an increase in the dollar amount of discharged debt usually does mean an increase in the default rate. But all things are not equal. Tuition has been skyrocketing at a pace well beyond inflation.[111] Thus even if the bankruptcy discharge rate stayed constant per borrower, one would expect to see an increase in both the number of debtors defaulting on loans and the aggregate amount of defaulted debts as more and more teenagers have to take out larger and larger loans to attend university. Data assembled to show increases in the number and amount of defaulted student debt on their own tell an incomplete story. For the "collections incentives" reasoning of saving the student loan programme by toughening up on bankruptcy to be persuasive, one would have to find data of sensitivity of the *default rate* to changes in bankruptcy law.

These data do not appear to be forthcoming. In fact, the General Accounting Office in the United States reports that while the total outstanding student loan portfolio swelled from $54 billion to $233 billion from 1990 to 2001, the *default* portfolio "only" doubled during that time (and actually fell in percentage terms) from $11 billion (20%) to $22 billion (9%).[112] Thus the data available actually suggest that the default rate on all student loans — not just those that go into bankruptcy as a consequence — has been *falling* in the United States. This has been attributed to collection systems improvements that have taken hold over the past decade.[113] These operational improvements, moreover, appear to be wholly unrelated to the periodic tinkering with the Bankruptcy Code's nondischargeability provisions, making the nexus between student loan programme solvency and bankruptcy rules a tenuous one at best.[114]

---

111. Tuition at four-year private colleges has risen from about $15,000 to $21,000 in real dollars over the past decade: see *Trends in College Pricing, supra,* footnote 2.
112. See *Report to the Secretary of Education, supra,* footnote 1, at p. 1 and Table 1.
113. See *ibid.,* at p. 6.
114. See *ibid.* Figure 1 shows that the National Cohort Default Rate declined relatively steadily throughout the 1990s — not in big drops after bankruptcy law amendments — from 22.4% in 1990 to 5.9% in 2000. And this is simply the number of loans per year entering repayment status that fall into default; the loans eventually finding their way to bankruptcy discharge are necessarily fewer. The General Accounting Office attributes this success to greater collection procedures, including, for example, matching data collected by the Internal Revenue Service. Changes to the bankruptcy

In fairness, one could accept all these data and conclude that there is no epidemic of student laxity in defaulting on loans through an overly attractive bankruptcy system, yet still have an overall concern about the solvency of the student loan programme. In other words, that the default rate is good does not mean it could not be better; that students are working hard to pay their loans does not mean they could not be working harder given the proper incentives. (This argument still runs into the seeming insensitivity of student default rates to changes in the bankruptcy laws, but let us accept for the moment, *arguendo*, the possibility of a salutary role bankruptcy law could play in influencing student conduct.)

The problem, if one follows this reasoning, is that the current treatment under U.S. law then becomes irrationally *lenient*. The law should not stop at nondischargeability, but proceed to deploy other levers available within a personal insolvency regime to maximize payments to a desired creditor (here, the student loan programme). Carrying this thinking through to its conclusion renders inexplicable the U.S. Code's reliance on dischargeability alone in dealing with educational debt. There are at least two other routinely employed bankruptcy mechanisms that could affect the treatment of student debt (as with any debt): priority and provability.

When a creditor enjoys priority, he receives favored distribution out of the finite assets of the debtor's estate. For example, certain family law creditors in the United States receive both priority payout,[115] and nondischargeability of debt,[116] thus according them maximal bankruptcy protection: what the trustee gets his hands on, the creditors get priority in, and what remains owing is not discharged. By contrast, student debt receives nondischargeability status only, but, curiously, no priority. The consequence of this treatment is a law that is only partially helpful to the favored creditor and a windfall to the debtor's other unsecured creditors, who avoid having the estate depleted by priority claims.[117]

---

laws do not receive credit: see *ibid.* (The default rates of the total loan portfolio do show some interesting trends which *could*, with a stretch, be linked to changes in the bankruptcy law lagged by a few years, but this is based only on a crude eyeballing of the numbers, requires some flexibility with defining the time lag, necessitates the explaining-away of an outlier, and has no macro-economic data adjustment! I thus raise this point for diehard readers only; I do not suggest it should inform the analysis. If inclined, see the General Accounting Office Report's Table 1 at p. 7.)

115. See 11 U.S.C. § 507(a)(1).

116. See 11 U.S.C. § 523(a)(5).

117. The unsecured creditors' windfall comes at the debtor's expense. The debtor would prefer to maximize his estate's payment of the nondischargeable debts for which he will remain responsible after bankruptcy.

Provability often gets forgotten in American circles, likely due to the 1978 Code's expansive definition of "claim".[118] When debts are not provable in bankruptcy, they are wholly unaffected by the proceedings (and, necessarily, not discharged). Thus student debt, as provable in a bankruptcy case in the United States, can theoretically be paid down by a debtor's estate after any priority debt has been extinguished, *pro rata* with other unsecured debt. By contrast, unprovable debt does not get paid at all; excess money in the estate goes to other unsecured creditors of the debtor. This is how the United Kingdom now treats educational debt — not just nondischargeable but unprovable altogether.[119] Thus dischargeability, priority and provability all play roles in a personal insolvency system in affecting the recovery of a favored creditor.

Considering these other bankruptcy mechanisms in light of protecting the loan programme's solvency as the justification for nondischargeability, the suggestion tentatively made by Ben-Ishai in reflecting on her study's findings, that student loan debts should not be provable in bankruptcy, is unpersuasive.[120] Why should they not be? The argument put forth in government reports accompanying bankruptcy reforms that drop provability in the face of nondischargeability is that it is "unfair" to the other unsecured creditors to leave student loans provable but nondischargeable.[121] That just begs the question. Why is it unfair? It is only unfair if one supposes that the status quo of nondischargeability-but-provability allows the favored creditor (here, the government student loan programme) to win "too much" in bankruptcy. But if one returns to the foundation that justifies the favored treatment — fear of the solvency of the student loan programme — one should not care about the other unsecured creditors, let alone worry that their treatment is unfair. On the contrary, their sacrifice of foregone benefit will bolster the student loan programme's solvency even further. In fact, this "solvency protection" model logically suggests one should accord the government priority in its education debt recovery as well. That would help the student loan programme solvency even more.

---

118. See 11 U.S.C. § 101(5).
119. See Higher Education Act 2004 (U.K.), 2004, c. 8, s. 42, reg. 39.
120. See Ben-Ishai, *supra*, footnote 9, at pp. 240-42. This is actually only one of her reflections. Her principal conclusion — which is persuasive — is that nondischargeability of student loans is not worth the candle and should be abolished altogether: see *ibid.*
121. See *ibid.* (discussing the United Kingdom and Australia).

So perhaps, to complete this thinking, subsidized student loans should become priority debts as well as nondischargeable ones. This would maximize the protection accorded the public student loan programme. In fact, maybe the undue hardship safety valve should be abolished altogether, so as to protect the programme even further. After all, if more repayment money can be squeezed out of student loan debtors in bankruptcy, it will necessarily add to the coffers of the student loan programme. There is theoretical consistency to this analysis, to be sure. But is this a fix? (And if it is, is it a fair one?) Consider that one way to bolster the solvency of the Social Security programme would be to make debtors who file for bankruptcy forfeit their Social Security benefits. It would certainly save money for the Social Security programme. Would it, however, be a fix, given the numbers involved? Doubtful. Would it be fair? Even more doubtful.

Returning to reality, the real problem, especially in light of the remoteness of bankruptcy law on student loan programmes, is the affordability of post-secondary education. In countries like Canada, where student tuition rates are being deliberately raised so the private-public sharing of education financing can be readjusted more toward the private side, the increase in student debt should not come as either a source of alarm or concern; it is an intended consequence. By contrast, in the United States, where tuition rates have been creeping upward consistently over years, the problem of student loan defaults should be raising larger questions about the cost of higher education and the appropriate role of government funding. That is a more important (and more difficult) task than tinkering with the Bankruptcy Code's discharge rules. Addressing higher education affordability concerns by rejiggering the bankruptcy laws is throwing a thimble of water on a conflagration. And the fire is afoot — indeed, the decision in the United States to reduce funding to the federal student loan programmes as part of the always unpleasant task of budget-tightening may be fanning those flames.[122]

Finally, as for the extension of nondischargeability to private loans, as the 2005 amendments to the U.S. Code do, it creates yet another disconnect between theory and law. How is the public fisc protected by subsidizing private lenders? To be sure, allowing nondischargeability for loans granted by private lenders should

---

122. See Chaker, *supra,* footnote 4, at p. D1. Note that state budgets are cutting student loan funding too. See Mark F. Smith, "Growing Expenses, Shrinking Resources: The States and Higher Education", *Academe,* July-August 2004.

theoretically lower the cost of capital for would-be students, but there is again a poor fit with the data that suggest an already low bankruptcy rate of student loans.[123] Absent data indicating a problem, one runs the risk, as the banker's association warned, of just playing favorites in the lobbying game.

## V.  CONCLUSION

This article has explored a handful of theoretical justifications for treating student debt as nondischargeable in bankruptcy. It has doubtless missed some. But in critiquing this collection of possible theories, it suggests that the most attractive ones seem to be the ones least reflected in many of the current bankruptcy laws, just as the ones most recognizable in today's statutes seem grounded in confusion and myth.

The theory that comes closest to persuasion as to why student loans should have restricted dischargeability in bankruptcy is that of the opportunistic debtor, "softly" defrauding the system if she walks away from publicly subsidized debt that enables a high-income career. Its most principled implementation in a bankruptcy system would be through the adoption of an income-contingent model of debt repayment, as occurs in New Zealand (and even that most likely fights a phantom menace given the lack of hard evidence linking students to abuse).

Unlike the overly broad U.S. approach, which lops all students together as presumptive frauds, the income-contingent one would separate debtors who earn more from those who earn less, progressively extracting more payment from the more financially successful. It would be both consistent with the most persuasive theory of nondischargeability and undistorted by the baseless spectre of moral hazard. In addition to being attractive theoretically, income-contingency could also help a troubling trend. Apparently certain "sub-prime" schools target a financially vulnerable client base by upselling classes and educational programmes of dubious worth, confident that they will have repayment leverage through non-dischargeability in bankruptcy.[124] An income-contingent approach might dry up this unwelcome market.

---

123. See General Accounting Office Report, *supra,* footnote 18.
124. See Pardo and Lacey, *supra,* footnote 14, at p. 41 (citing "fraud, waste and abuse visited upon the student loan program by some vocational and trade schools" as one determinant for findings that more than one quarter of student loan debtors in their

As for whether the income contingency should be rule-based and administered by tax officials or discretion-based and administered *ex post* by judges, Pardo and Lacey's study should give us pause about how income contingency is incorporated on the back end in American law. While the glass may be half full because income-contingency is seemingly incorporated, it is also at least half empty, because the implementation of the principle seems worrisomely arbitrary and expensive. Before one leaps to the conclusion that bright-line rules would improve upon vague standards, as many, such as Ben-Ishai, want to do,[125] consider what some perceive to be the unsatisfactory imposition of straightjackets on judges under the 2005 consumer bankruptcy amendments in the United States.[126]

The Ben-Ishai study makes a broad conclusion about the convergence of legal systems toward more unified bankruptcy treatment of educational debt. This is only partially correct. One must equally remember how fundamentally different the conception of higher education may be in the United States from Canada. The private benefit of education is the starting point for discussion in American bankruptcy opinions and often the ending point. By contrast, the Canadian history of having every university subsidized by the government and tuition set like utility rates may well have led to deep-seated differences in approach that may not unravel so quickly. That may be the reason why Canadian law treats student debtors much more generously than American law, such as by allowing relief after a period of years. Or it could be different public choice factors; for example, more of the Canadian population than the American has obtained post-secondary education per capita, so it could be that the proportionate political constituency of erstwhile university students is stronger.[127] Whatever the reason, while there may be convergence in some areas, the two systems are likely further apart than commentators such as Ben-Ishai suggest (or worry).

What remains distressingly clear, however, is that both systems are still struggling to design a coherent treatment of student loans in

---

study bankrupted by higher education loans did not even earn an undergraduate degree); see also Edelson, *supra*, footnote 41 (discussing Senate investigation).

125. See Ben-Ishai, *supra*, footnote 9.

126. See 11 U.S.C. § 707(b) (as revised, 2005).

127. See Organisation for Economic Co-operation and Development, *Education at a Glance 2005: OECD Indicator 2005* (Chart A1.3: Population that has attained tertiary education (2003)) (Canada ranked first; United States ranked eighth, between Belgium and Ireland), online at <http://www.oecd.org/document/11/0,2340,en_2649_37455_35321099_1_1_1_37455,00.html>.

personal insolvency built upon theory and data rather than stereo-type and speculation. While the United States seems to be moving in the wrong direction (and chose to ignore the recommendation of the National Bankruptcy Review Commission), Canada is at least talking of change and moving in the right one. This indeed seems to be not just a divergence, but a welcome one. Perhaps this article's attempt to put together the various theories of nondischargeability and sort the good from the bad will help those truly interested in principled legal reform.

## DECLARATION OF SERVICE

I, Aristea Hupp, declare the following;

1. I am over 18 years of age,
2. I am not a party to this action,
3. My address is P.O. Box 91 Solana Beach, CA. 92075
4. I served a true and correct copy of THE FOLLOWING;

Plaintiff Paul Hupp's

### 1. **PLAINTIFF PAUL HUPP'S CLOSING BRIEF ON APPEAL**

ADDRESSED TO;

The United States District Court-Clerk
880 Front Street, Suite 4290
San Diego. CA. 92101-8900

Mr. Timothy P. Burke, Esq.
Timothy P. Burke and Associates
1136 Fremont Street
Suite 108
South Pasadena, California 91030

Mr. John Reed Clay, Jr., Esq.
U.S. Department of Justice
1100 L Street, NW, RM. 10038
Washington, D.C. 20005

By placing said document into the United States Postal Service at Beaumont, CA.
with the postage fully prepaid on;

Friday, June 27, 2008

EXECUTED ON:
Friday, June 27, 2008

I declare under penalty of perjury of the laws of the State of California and the
United States that the forgoing is true and correct.
Declarant-Aristea Hupp_____/s/ Aristea Hupp